## GREENBURY B. WILSON *vs.* THOMAS B. WATTS.

The complainant, who was the mortgagor of certain real estate which had been authorised to be sold by a trustee to pay the mortgage debt, filed a petition in the case, stating that he had sold the same to the defendant, and the terms of sale, and asking that the trustee might be ordered to report the sale, which was done, and both the complainant and defendant filed a *written assent* to its immediate ratification. The sale was ratified by order of court, and the trustee executed a deed conveying the mortgaged property to the defendant. HELD:

Wilson *vs.* Watts.

*Per* LE GRAND, C. J.: That the complainant being *compos mentis*, and knowing what he was doing at the time, cannot have relief in equity against these proceedings, upon the ground that the transaction was *fraudulent*, and that it was never the intention of the parties that the defendant should thus acquire a title to the *whole property*, but only to a *part of it* under a secret unwritten agreement between them, because, by his own showing, he united with the defendant in the practice of a *fraud upon a court of justice.*

*Per* MASON, J.: That on failure of proof that the defendant practiced a *fraud* upon the complainant in inducing him to sign the application to the court to have the sale reported and ratified, the latter cannot set up in a court of equity a secret or private understanding between them, that defendant was eventually to have but a part of the property, in opposition to the *statute of frauds* pleaded and relied on by the defendant.

Where it cannot be shown that the contract had its inception in the fraud of the party against whom the relief is sought, but that he is merely making a fraudulent use of the statute to keep an advantage, obtained through the reliance of the opposite party on his good faith and fair dealing, no relief can be granted. *Per* MASON, J.

As a *general rule*, fraud vitiates all things in a court of equity, but when both parties to the suit have *knowingly participated in the fraud*, all relief as *between them* will be denied, and the maxim, *in pari delicto potior est conditio defendentis*, must prevail.

Where a party asking relief does not pretend ignorance of the character of the paper which he signed, and there is no fraud or mistake, a court of equity will not give a different meaning to the paper from that which its language imports.

In the absence of all fraud and imposition, equity will not set aside a bond for the weakness of the obligor alone, if he be *compos mentis*, there being no such thing as an equitable incapacity where there is a legal capacity.

Where a mortgage is executed under the act of 1826, ch. 296, the authority to sell is derived from the bond of the trustee and the power of attorney executed to him by the mortgagee, and not, primarily, under a decree of a court of equity as in other cases.

But where the sale is *reported* by the trustee, the jurisdiction of the court becomes complete, and equitable principles, such as are applicable to sales under decrees in other cases, prevail, and a sale without public notice may, therefore, upon consent of the parties in interest, be ratified.

APPEAL from the Circuit Court for Baltimore city.

Watts, the appellee, on the 21st of October 1843, mortgaged a tract of land in Baltimore county, called "The Bare Hill Farm," containing about ninety-three acres, to Johnzee Hook, to secure a debt of $1657.67. The mortgage was executed under the act of 1826, ch. 192, under the provisions of which

the mortgagee gave a power of attorney, to sell the property, to Samuel H. Taggart, Esq., who filed his bond in Baltimore county court, sitting in equity, which was duly approved by that court, and advertised the property for sale on the 23rd of April 1846, but afterwards withdrew it. On the 27th of April 1846, Watts filed a petition in that court, stating, that he *"had contracted to sell the said mortgaged property unto Greenbury B. Wilson, of the city of Baltimore, for the sum of* $2100, *payable in cash on the day of sale;"* that he had requested Taggart to report this sale, but the latter had refused to do so; and praying for an order directing the sale to be reported. This petition was signed by Watts and filed by T. P. Scott as his solicitor. Annexed to it was an admission of the facts therein stated, so far as he was concerned, signed by Wilson. Objections were made to this order by Taggart and Isaac Tyson, Jr., the latter of whom claimed an interest in the property and mortgage. Subsequently, on the 17th of November 1849, these objections were withdrawn, the cause submitted without argument, by Scott as solicitor for Watts and Wilson, and by Taggart as trustee and solicitor for Hook, the order to report the sale passed, the sale reported, a written assent to its immediate ratification signed by Wilson and Watts filed, and the sale finally ratified by order of court passed the 20th of November 1849, on which day Taggart executed a deed to Wilson for the whole mortgaged property, the purchase money ($2100) having been paid by him. The auditor subsequently stated an account, distributing the proceeds to the payment of the mortgage debt, interest, costs and commissions, and the balance ($15.66) to Watts, which was finally ratified by the court.

The object of the *present suit*, instituted by Watts, is to obtain relief against the contract set forth in the above petition, and the proceedings consequent thereon, and against the deed from Taggart to Wilson.

The *original bill*, filed on the 14th of November 1853, after referring to this mortgage, alleges, *that* in 1838 or 1840, a valuable copper mine was discovered on the property, and leased first to one Petherick, and subsequently to Samuel

Davis, for five years, from June 1845, paying a rent to complainant of $2 per. ton for the ore dug therefrom; *that* this discovery becoming public, Wilson came out from Baltimore, called upon complainant, became known to him, and desired to obtain, by some means, an interest in the mine, and requested complainant to get Davis to alter his lease, and that he would join in partnership with Davis and complainant, furnish the money and divide the profits, but Davis refused, and afterwards sold one-half his leasehold interest to Tyson; *that* the mortgage debt being now due, complainant being poor, had frequent interviews with Tyson for the sale of his interest in the property to pay the debt, during which interviews Wilson frequently came to him and dissuaded him from making a bargain with Tyson; *that* Taggart had now advertised the property, the day of sale was fast approaching, complainant greatly distressed, and Wilson, by frequent interviews and conversations, had acquired great influence over his mind, and complainant consequently placed great confidence in Wilson, and believed him to be his best and only friend; *that* in consequence thereof complainant agreed with Wilson, that if he would pay the mortgage complainant would give him one-half interest in the mineral interest of the mine; *that* Wilson then called upon Taggart and offered to pay the debt by giving his note, which Taggart declined to accept, or to stop the sale; *that* Wilson then confidentially agreed with complainant to buy in the property on the day of sale, but Tyson hearing of Wilson's intention to buy, induced Taggart to stop the sale; *that* Tyson had paid a large portion of the mortgage, received an assignment of it from Hook, and was anxious to get possession of the mine, but Wilson was anxious to prevent him, and for this purpose, and to carry out the private agreement between Wilson and complainant, and to *give him the mortgage debt only*, complainant signed the petition above referred to *for this purpose only, and not to give Wilson any greater estate in the property than the mortgage debt,* until other conveyances were made accurately defining and limiting his right and interest in the mine, which petition was drawn by T. P. Scott, who was Wilson's counsel at the time, and paid by

him; *that* complainant had been offered, by various persons, much more for one-half his interest in the mine than Wilson had agreed to pay the mortgage for, but reposing great confidence in Wilson's friendship and advice, he had refused the same; *that* complainant now became involved in a law suit with Tyson in reference to the property, and was very much distressed by it and his embarrassed circumstances; *that* Wilson, about this time, said he would defend that suit and must appear as owner, and complainant gave him, at his request, all papers relating to the suit and muniments of title relating to the property; *that* Wilson then said complainant must give him an assignment of the mortgage and he would then settle with Taggart forthwith, and complainant must then give him a deed for one-half the mineral right of the mine; *that* Wilson engaged T. P. Scott to defend the suit, and complainant, at Scott's office, executed what he supposed was an assignment of the mortgage debt according to this agreement, which Wilson subsequently said must be kept secret, and the written agreement would be, and was finally, destroyed; *that* complainant received from Wilson during these events frequent letters, expressing deep interest in the result of the law-suit and in complainant's distressed condition, and inspired complainant thereby with great hope and trust in Wilson's friendship; *that* after the arrangement for destroying the above agreement had been made, Wilson said that agreement did not suit him, and before he could pay the mortgage complainant must give him another agreement; *that* still reposing great confidence in Wilson complainant signed another agreement, marked J, dated 15th of February 1849, drawn by Wilson, as follows:

"Thos. B. Watts and his wife, Mary Ann Watts, has sold to Greenbury B. Wilson one-half of the farm he now occupies on Bare Hill, call'd Bare Hill, cont'g $93\frac{1}{3}$ acres, more or less, together with the entire controul and privilege of mining for copper and other minerals, and carrying away on the whole tract, forever, with the understanding that one-half of the nett proceeds of all minerals are to be paid over to said Thos. B. Watts, and his heirs and assigns; the said Thos. B. Watts,

his heirs and assigns, to have the exclusive benefit of all crops rais'd by him on said farm.

*Baltimore, 15th Feb'y* 1849.

(Signed,)        THOS. B. WATTS,

G. B. WILSON.

In the event that G. B. Wilson raises a stock company, or can sell the whole tract for a handsome remuneration, to the mutual benefit and advantage of both parties equally concerned, then the parties hereto are respectively bound to such an arrangement, their heirs and assigns.

Witness this 15th February 1849.        A. CLIFTON."

*That* Wilson did not pay the mortgage debt until sometime subsequent to this agreement, and in consequence thereof the property was again advertised for sale about the month of November 1849, very much to complainant's surprise and disappointment; *that* in that month complainant received a letter from Wilson, dated 22nd of November 1849, (letter K,) stating that "the business of the mortgage has been settled and paid off to-day"—"we expect you will be in to-morrow morning, *as it will be necessary for you to deed one-half of Bare Hill to me, according to our agreement.*" *That* complainant then came to town and told Wilson his wife was sick and could not come, but if Wilson would draw up a deed his wife would sign it in the country, to which Wilson assented; but no deed was ever sent out by him; *that* Wilson subsequently told complainant that he had determined to charter the mine, and he and complainant could settle then; *that* though subscriptions for a stock company were obtained Wilson refused to form it, and did not accordingly settle with complainant.

The bill further alleges, *that* previous to June 1850, Wilson purchased out the leasehold interest of Davis and Tyson, (which interest expired at that date,) and took possession of the mine under agreement J, and has taken all the profits of it to his own use, the complainant remaining, however, in possession and tillage of the soil under said agreement; *that* complainant, according to this contract, was entitled to one-half the net profits of the mine, and was thereby made a

46        v.9

partner with Wilson in its productions, but Wilson has rendered complainant no account of the same in any way whatever; *that* no deed to him has ever been made by complainant and wife, and that complainant, by no act or arrangement whatsoever, in law or fact, ever intended to give him the legal title to and control of the mine except by deed, in accordance with agreement J; *that* all petitions, confessions and admissions in the *mortgage case of Hook vs. Watts,* were filed and made with the only design, expressed and understood between Wilson and complainant, of carrying out said contract, paying the mortgage debt, assigning the same only to Wilson, and of removing objections made thereto by Tyson; *that* Wilson, in a letter to complainant, dated November 7th, 1849, stated that he would not pay the mortgage debt till the "Lion's paws" (meaning Tyson) "are entirely clear of the transaction;" *that* the property was not bought by Wilson at public sale according to the act of 1826, ch. 192, but the sale from Taggart to him was made by virtue of a private agreement between Wilson and complainant, and for the purpose above mentioned simply; *that* Wilson, pending these proceedings in the mortgage case, and subsequently thereto, did not claim an entire legal title in the mine, and has, in letters and conversations, admitted an interest in complainant; *that* any such claim, by virtue of the deed from Taggart, would be contrary to agreement J, and that Wilson has received from the proceeds of the mine more than enough to pay the mortgage debt, interest and costs.

The bill then *prays* for an account of the net profits of the mine, and after deducting the money paid Taggart, and reasonable costs and charges, that Wilson may be required to deed back to complainant the property, *or* such an interest therein as, by agreement J, complainant is justly entitled to, and for general relief.

The contents of the letters from Wilson to Watts, dated at various periods between the 22nd of October 1846, and the 15th of January 1852, referred to in the bill and filed as exhibits with it, are sufficiently stated in the opinion of the court below and of Eccleston, J.   Letter K, dated 22nd of November 1849, is in Wilson's handwriting, *but is not signed by him.*

The *answer avers*, that defendant's knowledge of the mine was chiefly obtained through the representations of Watts, who first used it as an inducement to persuade respondent to buy the Bare Hill farm, representing the mine to him in a favorable light and soliciting him to buy the premises; *denies* that respondent requested Watts to get Davis to alter his lease, and offered to enter into partnership as stated in the bill; *admits* that Davis sold one-half his leasehold interest to Tyson, but knows nothing of any interviews of Watts with Tyson for a sale of the property; *admits,* that in consequence of the frequent importunities of Watts, he agreed to give his notes for the mortgage debt due to Hook, who had become dissatisfied with the security afforded by the property, which notes Taggart declined and advertised the property for sale; *that* respondent is not aware he had any influence over the mind of Watts, and solemnly denies that he used, or attempted to use, any fraudulent or improper means to acquire any influence or control over him in any matter; *denies* that he ever agreed to pay the mortgage debt for one-half interest in the property, and avers, that at the time he agreed to purchase the farm, there was an unexpired lease to Davis of the mineral portion of it, and a suit was about to be instituted, or was pending, in chancery, in regard to Petherick's lease; *admits* that Hook assigned part of the mortgage to Tyson, but does not know that Tyson was, at this time, anxious to get possession of the property, but was subsequently informed by Tyson, that when he worked the mines with Davis he lost money by the operation; *denies* that he ever interfered with the sale of the property, except as particularly requested by Watts, and in accordance with his directions; and denies, emphatically, that any such private agreement was ever made between him and Watts, as alleged in the bill, or that he ever agreed to purchase the mortgage debt only; nor does he understand how Watts, the *mortgagor*, could have assigned the mortgage debt; *denies* that any such written agreement between him and Watts ever existed, or was destroyed, as alleged in the bill, and that the only written agreement between them, in relation to the purchase of the property, which has been mutilated or destroyed

by having the name of Watts cut or torn therefrom, is the following, marked No. 1:

"It is hereby agreed and bargained, this 25th day of April 1846, between Thomas B. Watts and Greenbury B. Wilson, that the said Thomas B. Watts sells to the said G. B. Wilson all those tracts of land bordering on Bare Hills, under the order of Balto. county court surveyed and laid out for ninety-three acres, with all the improvements, rights and privileges of mining for any kinds of ore or minerals, with the right of his mother's life estate therein, also to be conveyed to said Wilson, to have and to hold to the said Greenbury B. Wilson, his heirs and assigns, in fee, forever; the said Thomas B. Watts binding himself and his heirs and assigns, to carry out and execute any deed or deeds, or instrument of writing, to the said Wilson, his heirs and assigns, in fee, and clear of all incumbrances, on the payment of the sum of money due under mortgage to Johnzee Hook, and on payment of said mortgage and a full and clear title of said lands to the said G. B. Wilson, his heirs and assigns.          (*Mutilated.*)

Witness:—*Luther Wilson.*"

*That* this paper states, fully and truly, the agreement between them, was fairly made and executed, and was finally consummated by the deed from Taggart; *that* Watts agreed to sell him the property upon the terms set out in the *petition filed in the mortgage case of Hook vs. Watts; admits* that Scott acted as his attorney at that time, and was paid by him, but denies that he or his attorney practiced any fraud or imposition upon Watts in the matter of this petition, and respondent refers to the same and all the proceedings in the mortgage case, and to the deed from Taggart, to vindicate his title to the property, and relies upon and pleads the same in bar to the relief sought by the bill; *denies* that he ever entered into any agreement with Watts by which he was not to have any more or greater estate in the property than the mortgage debt only, until other conveyances were made, defining and limiting his rights in the mine; *that* he is not aware that Watts was offered, before respondent's purchase, a sum sufficient to pay off the mortgage, for up to the time of his purchase a

great deal of litigation had been pending in regard to the property: the lease to Petherick had been the source of protracted contention, the life estate of Watts' mother had been an incumbrance, the lease to Davis, and his assignment of half to Tyson, had not expired, the fact publicly alleged by Tyson, that he had lost money in his mining operations with Davis, and the sterility of the land for agricultural purposes, had operated to make a sale of it for enough to pay the mortgage a matter of uncertainty at the time respondent purchased; *admits* the authenticity of the letters filed with the bill, but submits that they evidence no such private contract or secret agreement, as is alleged in the bill; *denies* that agreement J ever went into effect, because from its date to that of Taggart's deed, Davis held possession of the property, so far as related to the mine, against respondent and his own release; no nett profits, therefore, could be realized under agreement J, and no work was done in the mine under it, but considerable expenses were paid by respondent for counsel fees and legal proceedings against Davis, which finally resulted in securing respondent in lawful possession of the property in July 1850, after the date of Taggart's deed, in which he submits agreement J was merged and determined; and respondent, by way of answer, *relies and insists upon the statute of frauds and perjuries as a bar to the relief sought by the bill, and as an answer to any alleged agreement or contract touching this land: admits* that he has rendered no account to Watts of the profits or expenses of his mining operations since he became the absolute purchaser of the property, and it was not until respondent, relying upon his title, had expended large sums in preparing the mine for work, that the unfounded pretentions of Watts were made known; *denies* there was any secret agreement between him and Watts in regard to the mortgage deed, and avers, that the petition and proceedings in the *mortgage suit* contain a true statement of the facts and circumstances attending the purchase, all which proceedings were duly considered and the sale finally ratified by the court; *denies* any partnership or joint ownership, but admits that Watts has remained on the land, by his consent, for tillage and farming, and has boarded

some of his miners at various times, for which he has individually received compensation from respondent, according to their mutual agreement, together with the use of the farm as aforesaid; *admits* that at one time he did propose to raise a company to work the mine, but after many months the person employed being unable to raise the necessary amount of subscriptions he withdrew his offer; *insists* that Watts cannot ask the court to set aside respondent's title upon the hypothesis that he and his wife agreed to give an additional deed for one-half of the property, which they never executed; that nothing in the letters, or any other exhibits filed with the bill, can impair his title; that the purchase was fairly made, fully assented to by Watts, executed *bona fide* by Taggart, and finally ratified by the court; that confiding in his title thus solemnly authenticated, he has expended a vast amount of labor, skill, and capital at his own risk, with a view to his own advantage if he should make a profitable discovery, and to his own loss if he did not, and he, therefore, submits, that the unfounded pretensions of the complainant cannot prevail.

The *proof* in the case taken under the commission consists of various *written* exhibits including those filed with the bill and answer, and the *oral* testimony of witnesses. Among the exhibits filed by the defendant is the following, marked P, dated June 1st 1849.

"All my right, title and interest in the Bare Hill copper mines, and the houses and improvements appertenant thereto, during the term of five years from the tenth day of July 1845, with right of reversion and possession thereof, as secured to me, I hereby assign and transfer to G. B. Wilson for value received. Thos. B. Watts, (Seal.)"

This paper was admitted to be in the handwriting of Watts, both the body and signature, and is identical with complainant's exhibit A WB, also signed by Watts, but the body of which is in the handwriting of Wilson.

After these papers were filed under the commission, the complainant filed a *bill of discovery*, alleging: *that* paper P was obtained from him merely for the purpose of being used by Wilson in a suit then pending between Wilson and Davis,

relative to the possession of the mine, and also with the express promise that he wanted and would use it for no other purpose, and that it was given simply to aid him in getting possession of the mine from Davis by purchase of the unexpired term of Davis' lease: *that* the petition in the *mortgage case* referred to, and made part of his answer, Wilson obtained from him, with the express promise and understanding that it was necessary to enable him (Wilson) to defend complainant against the claims of Tyson, and that Wilson also stated to complainant's wife and to him, that this petition was intended merely as a matter of form. The bill then prays for an answer, under oath, to the following specific interrogatories:

1st. Did you not bring out and present to Watts, at his house on Bare Hill farm, paper AWB, and ask him to sign it?

2nd. Did you not then say to him, after he signed it, that he had better write a paper in his own handwriting like said paper, and did not Watts accordingly write for you paper P?

3rd. Did you not state to Watts at the signing and writing of paper P, that you wanted it at the trial then coming on between you and Davis, and for no other purpose, or words to that effect?

4th. Did not Watts sign paper P, a few days before the trial came on between you and Davis, at the Bare Hill copper mines?

5th. Did you give Watts any money or other consideration for these papers at the signing thereof, if so how much and what, and did you take from him any receipt therefor?

6th. Did not E. J. Kilbourn, as your counsel, present said paper at the subsequent trial between you and Davis?

7th. Did you ever have any conversation with the wife of Watts about the petition filed against Taggart, referred to in your answer?

8th. Did you ever say to her that you heard she was dissatisfied about said petition, and that she need not be uneasy, that it was a mere matter of form, and was necessary to enable you to defend her husband against Tyson; but if she was dissatisfied you would throw it up and let Tyson take it, and that you expected to make a little money for yourself and a great deal for Watts, or any words to that effect?

9th. Did you not State to Watts at the signing of said petition, that it was a matter of form only, and that you wanted it merely to carry on the suit with Tyson?

Wilson, in his *answer* to this bill, *denies* that paper P was obtained merely for the purpose alleged in the bill, or that he ever made any express promise that he would use it for no other purpose: *denies*, moreover, that it was given simply to aid him in getting possession of the mine from Davis, as alleged in the bill, but avers that it was duly executed for the purpose of giving him evidence of the absolute purchase, which he had before that date made in good faith of the Bare Hill farm and copper mine of Watts, which evidence he truly stated to Watts he wanted to use at a trial then about to take place between him and Davis in regard to the possession of the mine, because his deed thereto was not then executed by Taggart. He denies that there was any other understanding or promise by him in regard to the petition in the mortgage case than that which appears from its terms. He then answers the specific interrogatories as follows:

To the 1st, that he did present to Watts paper AWB, and asked him to sign it as evidence of his sale to respondent of the farm and mine, so that he might use it at the approaching trial between himself and Davis, because the deed from Taggart was not then executed.

To the 2nd, that he never saw Watts sign said paper, nor did he know, until very recently, that his name was attached to it, but that Watts some time after the request made by respondent, as above stated, delivered to him paper P, which he stated was in own handwriting, signature and seal.

To the 3rd, that he did state to Watts before he wrote and signed paper P, that he wanted to use it at the trial then coming on between him and Davis, but never said he wanted it for no other purpose, nor did he use words to that effect.

To the 4th, that he believes Watts' did write and execute paper P, a few days before the trial between himself and Davis at the mine.

To the 5th, that he paid no money consideration at the time of signing paper P, as the greater part of the consideration or

purchase money for the farm and mine had been stipulated by Watts and respondent to be paid to Taggart, which respondent did subsequently pay in good faith according to his agreement.

To the 6th, that Kilbourn, his counsel, did present paper P, at the trial between himself and Davis, and used the same in presence of Watts as evidence in the case.

To the 7th and 8th, that he never did converse with Watts' wife about the petition in any respect.

To the 9th, that he never did state to Watts at the time of signing the petition, that it was a matter of form only, and that he wanted it merely to carry on the suit with Tyson, a matter he never would have entered into if he had not purchased the property.

*Oral* testimony was then taken, in substance as follows: *Samuel Davis* testified *that* he rented the mines from Watts for five years, and was to pay $2 per ton for the ore raised by him; *that* he worked the mine jointly with Tyson for three years and a half, and took out in that time between six and seven hundred tons of ore which yielded on the average $54 per ton; *that* the gross amount of sales was, to the best of his recollection, $21,000 or $22,000; that he met with Wilson, who proposed to witness to carry on the mine jointly, each to have an equal share of the profits and to bear equally the expenses, and said if witness would accede to this proposition Watts would extend his lease; *that* Watts' means were limited in April 1846, that he stood in need of money and that his property was offered for sale in the papers by Taggart, to satisfy a mortgage, as witness heard; *that* Wilson represented himself to witness as the friend of Watts, this was about April 1846, that Wilson said he felt a disposition to befriend Watts to prevent him from being cheated or defrauded by Tyson; witness does not recollect that he said anything more on that occasion; *that* Wilson stated to witness that he had offered to pay a certain sum or sums of money due Hook by Watts, this was in the year 1846, but he does not recollect the month; *that* he sold one-half his lease to Tyson in Sept. 1845, and received $1000 in cash, and was to receive, in addition, $4000, if it could

47        v.9

be got out of the mines clear of expenses, that he did not receive the whole $4000, sometimes the mines were paying and sometimes not; *that* Tyson evinced a desire to become the owner of the mines or to purchase them; that Wilson and witness had frequent conversations in reference to Tyson's wishing to become the owner of the mines, and that Wilson said Tyson was endeavoring to wrong Watts and to get the mines for less than their value, calling Tyson sometimes rather opprobrious names; *that* he is familiar with the value of copper mines, and that in April 1846 these mines were worth $6000, and witness thinks would have brought that sum at public auction; *that* in the Spring of 1850, the mines were not in working order having considerable water in them, which witness thinks could have been taken out for $200 with the use of the machinery that was there.

On *cross-exammination* this witness proved, *that* an injunction was issued against him at suit of Wilson to restrain him from working these mines, and that he was arrested for contempt of this process in the fall of 1849, as he thinks; *that* he received somewhere about $1200 net profits from working these mines; that he worked them on his own account from the 10th of July to the 18th of Sept. 1845, and from that time jointly with Tyson, till early in 1849, and then undertook to work them about a month and ceased, and that he was not able to pay his debts at the close of his lease; *that* Watts, as a justice of the peace of Baltimore county, issued a warrant against him at the suit of Wilson, in a plea of trespass for entering upon the premises where the mines are situated and hindering his hands in the performance of their labor; *that* he always understood that Tyson sold to Wilson his interest in the mines.

*Johnzee Hook* testified that he loaned Watts the sum of money mentioned in the mortgage to him, that he always considered the farm security enough for it, and was not dissatisfied therewith but wanted the interest of his money to use; *that* while Watts occupied the farm it was twice offered for sale by Taggart, as trustee, under this mortgage, but it was not sold at public auction; *that* in 1846, he believes, witness saw

Wilson at his, deponent's brother's house, and took him to be the friend of Watts, that Wilson wanted to take up the claim against Watts' property and of course witness took him to be the friend of Watts; *that* Watts was poor at that time as far as witness knew; *that* Wilson offered to take up the mortgage by giving his notes; *that* since February 1849, Watts has worked the farm, lived on it, and still lives there; *that* in April 1846, the farm was worth a good deal more than the mortgage debt, and he would have been willing to give more for it, and that it was much more valuable in 1849; *that* he knows of no other support that Watts has for himself and family except this farm; *that* he thought Watts had a good deal of confidence in Wilson as a friend, that is he heard so; and witness took Wilson to be his friend when he came over to deponent's brother's house, and from what he saw on that day, he thought Watts placed confidence in him; the way deponent took him to be Watts' friend was, that Wilson was to take the debt of Watts on himself; *that* the soil of the farm is poor, but he thinks part of it is tolerably easy of improvement.

On *cross-examination* he proved, *that* he agreed to take Wilson's notes for the mortgage, but they were not given because his counsel Taggart would not accept them; *that* Watts has made very small crops on the farm but he does not know the value of them; *that* Watts has boarded a few hands working at the mines, how many he does not know, sometimes more sometimes less.

*Thomas Mitchell,* who had worked at the mines, testified, that in June 1849, to the best of his knowledge, he had a conversation with Wilson in the presence and hearing of Watts in relation to deponent's employment at the mines, in which Wilson proposed that deponent should go there to take charge of the mine under Watts and himself, for he said they intended to work it systematically, and to make captain of deponent; that deponent never did anything else, as a business, but work at copper mines, and he ought to be acquainted with their value, and that these mines in the fall and summer of 1849 ought to have brought, at public auction, $10,000 at the least calculation.

*Samuel H. Taggart,* in whose hands Hook placed the mortgage for foreclosure, testified, that he twice advertised the property for sale; that as well as he can recollect, after the first or second advertisement, Wilson called at deponent's office, as he understood, as the friend of Watts, and stated that he had not the money, but offered his notes for the whole amount of the debt, which deponent declined taking; that Tyson paid deponent about $800 on the mortgage after the property was advertised, which fact was known to Wilson; that when called on to make a deed to Wilson for the farm he refused to do so without the order of the court, being a trustee and being under the impression that had he executed the deed he would not have been protected against Watts and his wife; that he had not seen Watts on the subject and does not know whether Watts knew that this deed was to operate as a mortgage or as an absolute conveyance, neither did he see Wilson about the deed, but whatever was said to witness was through Mr. Scott, Wilson's counsel, who paid witness the whole amount of the mortgage debt, and that Watts was not present when the deed was executed.  On *cross-examination* he stated, that he reported the sale to Wilson because there was a petition filed by some one, but whom he cannot recollect, and an order of court requiring him to do so, and that Tyson interposed a claim which was a matter of controversy in court a considerable time.

*Isaac Tyson, Jr.,* bought from Davis one half-interest in a lease from Watts of the mine for five years, upon the terms stated in the testimony of Davis; that he worked the mine with Davis for upwards of three years, and raised 445 tons of ore which brought $20,000; but he never considered the mines well worked; that Watts and Wilson called together at witness's counting room, as well as his recollection serves him, and Wilson appeared to be the friend and counsellor of Watts, witness so considered him at the time; when they came they offered the mines to witness and wanted to know what he would give for them; the property offered was that part of the farm where the mines were which had been leased to Davis: witness does not recollect whether they made any distinct offer to him or whether he made them an offer; that about the

same time witness learnt that $3000 would be taken for the mines, and that part of the land leased to Davis, sixteen acres; that he sent out Farquharson to negotiate the matter and authorised him to give the $3000 for the mines, and even to go higher for them; that while interested in the mine witness bought of Buchanan some adjoining land which he considered necessary should he acquire a permanent interest in the mine, and for which he paid $6000, and when he sold to Wilson, he sold this land with his interest for the unexpired term of the lease, about one year, for $8000; that at this time witness believes the farm in fee would have commanded very readily $10,000. On *cross-examination* he stated he did not know the expense of raising the ore, but the upshot of the business was that the expenses eat up all that was received from the sale of the ore, and there was no profit at all made, but he always supposed the loss was owing to the imperfect mode of working the mines.

*James Farquharson* was employed in 1846, he thinks, by Davis and Tyson, to negotiate the purchase of the mines from Watts, and his mother who had a life estate in them; that he went out to the mines, and had three or four interviews with Watts endeavoring to get him to name a low price for them; that Watts said he would take $3000 for the mineral right reserving to himself one fifteenth of the ore raised, and the dwelling house and a few acres of land attached to it were not to be included; that witness advised Tyson to accept this offer but he declined, saying Watts would be forced to take less; that a few days afterwards Tyson came to witness much excited and told him to go at once to Watts and offer an advance of, he thinks, $1000 on Watts' proposition, and if these figures failed, to see what the property could be had for; that witness went forthwith to Watts but found him indisposed to talk; that he made Watts the offer authorised but he declined every thing, saying, it was too late, that he had made other arrangements; this was in the spring or summer of 1846, and that Tyson was exceedingly anxious to get hold of the property.

*Lydia T. Watts*, a daughter of the complainant, testified

that in the spring of 1846, she was present at a conversation between Wilson and Mrs. Watts, her mother, in which Wilson said that he had heard that Mrs. Watts was dissatisfied; he said if she was not satisfied he would throw up the law suit, give it back to the lawyer's hands, and let Tyson take it, if she was satisfied he would do a good part by her as he expected to make a good deal of money for Watts and some for himself; that Wilson was frequently at the house of Watts, two or three times a week, and every Sunday; that Watts placed confidence in Wilson at the time, as his friend.

*David Stewart* testified, that Tyson desired deponent to ascertain from Watts his disposition as to the sale of the mineral land of Bare Hill; that Tyson stated there was a suit then pending, and that he had been informed that deponent had a friendly influence over Watts, and he thought that through deponent's agency some arrangement might be made for their mutual benefit; the result of the interview with Tyson was, that deponent addressed Watts a letter, dated February 7th, 1846, but which he believes was written and sent in February 1847, in which belief he is confirmed by date of the second letter, July 9th, 1847. Deponent has a recollection that it all occurred in 1847. (These letters express the writer's wish to see Watts in regard to the mineral lands of Bare Hill;) deponent did not hear from Watts, either verbally or in writing, in response to either of these letters, but after the first or second letter, and he believes after the second, but cannot affirm this positively, Wilson came to deponent's office and represented that he had come, at the request of Watts, and in consequence of deponent's having written to him, (Watts,) and requested to know the object of the proposed interview with Watts. Deponent told him he was a friend of Watts, and desired, if he could, to promote some satisfactory arrangement between Tyson and Watts, in regard to the mineral lands of Bare Hill; Wilson said that no such arrangement could be made with Tyson, that Tyson wanted to take advantage of Watts, and that he intended to protect Watts, so far as he could, from imposition; Wilson spoke of said mineral land as being very valuable, and said they were important to Watts as his main

dependence, and that Watts should not sacrifice them; that there was no chance of his agreeing with Tyson for them at anything like a fair value; deponent stated to Wilson, that his agency was a friendly and not a professional one, and there the interview closed.

*John T. Watts,* a son of the complainant, testified, that as well as he can remember, about sixteen months ago, Wilson spoke to deponent about leaving home, (it was soon after deponent had left home,) and said deponent was doing very wrong in leaving his father as he had done, that the business was then about to be settled between Tyson, Davis, himself (Wilson) and deponent's father, and he thought then they would be able to realize something right handsome from the copper mines, and said he saw no necessity at all for deponent's leaving home; that Wilson was very often at the house of Watts in the spring of 1846, and after that time; that in the spring of 1846, his father was very scarce of money indeed, and also after that time; that the little money his father got was from the produce of the farm and from the mines; the money from the mines was paid to him by Wilson:

*Michael O'Donnell,* a laborer who had worked at the mines, testified, that in the spring of 1850, Wilson asked him if Mrs. Watts was not dissatisfied? deponent told him he did not know; he then said she had some advisers who had advised her not to sign over her right and title to the place to him, and he told deponent to tell her not to be dissatisfied, that he would make a little money for himself and her too, and if that would not satisfy her, as to the writing that was between him and her husband, it was not of much consequence, for when the law suit between him and Tyson was over, he would give them up again, and if that would not satisfy her he would throw the law suit up to the counsel and let Tyson take the place to himself.

*Ferdinand Welsh* testified, that he always considered Watts a poor man; that he cannot refer particularly to the spring of 1846, but always regarded him as a working man for his living.

*Robert Wilson* proved, that he met Wilson at the house of Watts frequently from 1846 to 1850; that in 1846 or 1847,

Wilson stated to deponent, in the presence of Watts, that he was the friend of Watts, and that he would merely undertake this thing to get him out of the clutches of Tyson and Davis; he said they were both trying to rob him (Watts) out of his house and home; that deponent had similar conversations with Wilson, at his (Wilson's) office, at the farm and at the mine; that Wilson said to deponent, in the presence and hearing of Watts, that the mine was invaluable, and there was no telling the amount of money it was worth, and that he would not take any amount of money for it if he was Watts, that it would turn out to be a fortune to him; he also said, if he was Watts he would not let Tyson have it for any consideration; this conversation occurred in 1846 or 1847, and before the law suit between Watts and Tyson was commenced; that Wilson told deponent, that when Watts gained the law suit against Tyson, it was his (Wilson's) intention to put it into a stock company, putting the capital stock up to about $100,000, and that they (Watts and Wilson) would retain either $15,000 or $25,000 a piece, so as to have the greater portion of the controlling power of the working of the mines, or words to that effect, or this was what deponent implied from his conversation—that was what he said; this conversation occurred between 1846 and 1847; that Watts was quite poor in April 1846, and has been so ever since.

*George W. Waters* and *David Keener* proved the amount of ore sold by Wilson to the companies of which they were clerks and agents, since June 1850; the gross amount of sales was upwards of $25,000.

*Christian Keener* was employed by Wilson for the purpose of raising subscriptions for a stock company to work these mines; the subscribers agreed to pay Wilson, the present proprietor of the property, $20,000 in money and $25,000 in stock of the company when organized. Subscriptions were obtained to the amount of $60,000; a charter was obtained from the Legislature, and among the names of the corporators are those of Wilson and Watts; that the mines would have sold at auction at any time since deponent's knowledge of them, at from $10,000 to $20,000, to the best of his judg-

ment; that he understood, in a conversation with Wilson, that Watts had an interest in the mines; that in the month of October or November, 1851, deponent met Wilson and conversed with him about the formation of the company and deponent's commission, and then said to him, "You don't own all the Bare Hill mines, Watts has an interest of one-half," to which Wilson replied, "He has just such an interest as I please to let him have;" deponent replied, "Not so, I have seen your written agreement as the purchaser of one-half only." This was all the conversation he had in reference to Watts' interest; that deponent went to search the records for a deed to Wilson, and met Watts outside, and told him he could find no deed to Wilson; this was in August 1851. That he knows the handwriting of Luther Wilson and has seen him write, and the signature to exhibit No. 1 he thinks is not in the writing of said Luther Wilson, and he bases his belief from the opportunities he has had of knowing his handwriting, and from a comparison of this signature with the signature by Luther Wilson to two receipts which are filed in the case: (these receipts were to bills made out against the witness Keener and signed by Luther Wilson.)

*George W. McConkey* had been intimately acquainted with Watts for about thirty years, and on being asked, whether he was a man of business or business habits? said, that it depends on the kind of business; deponent would say, if you include business of importance, that Watts is not a man of business habits, if there is any financiering in the business Watts is not a man calculated to transact business of that kind.

*On cross-examination* he said, Watts had acted as a justice of the peace of Baltimore county for several years, he thinks he was re-appointed, but whether he swore in deponent does not know.

*Edward Rider* has known Watts for many years, and really thinks he is not a man of business and business habits; that Watts' means, since April 1846, and at that time, have been and are very limited. On *cross-examination* he proved, that Watts can read and write, and he has seen some of his official acts as a magistrate, but he doubts whether he understood

48    v.9

what he has written; he has written pieces which deponent thinks he did not understand, he copied them without understanding them; he does not think Watts is a man of ordinary understanding, competent to make contracts; deponent would not trust him to make a contract for him; that Watts has acted as a justice of the peace for Baltimore county, but he does not know how long, and he never thought him fit; he does not know whether he ever acted as a judge of the magistrates' court; he cannot tell exactly the time he acted as a justice, but he saw some of his judgments two or three years ago; he writes a pretty fair hand; does not know whether he is in the habit of doing all his own business or not; thinks Watts is in possession of his usual mental faculties; does not know of his ever having been deprived of his mental faculties; he does not know much of Watts' transactions, his buying and selling has been in a very limited way since he has been in deponent's neighborhood; he is a man who is *compos mentis*, but his business habits are very limited; he does not know, but should judge Watts conducted his business himself.

*Richard Hook* testified, that in August or September 1849, he had a conversation with Wilson on the subject of the Bare Hill mines, the substance of which was, that Wilson was acting as the friend of Watts; deponent understood him to say, he was the friend of Watts and intended working the mines jointly with him when they got rid of the difficulties then hanging over their heads, referring, as deponent understood, to the suit then pending between Wilson and Davis in reference to the possession of the mines; this is the substance of the conversation as deponent recollects it, the words he does not remember; that he has known Watts some twenty years, and should not judge that he was a man of business and business habits. On *cross-examination* he said, that Watts was one of the associate justices of the district court for the 3rd election district of Baltimore county for a short time; deponent was a justice of the same court, at the same time; Watts sat at said court two or three times, but took no active part in the business of the court; this was in the latter part of 1850 and in 1851; he believes Watts does transact his own business, and

should judge he was a man of common sense; deponent never had much business with him; that he writes well and reads, but deponent is not able to say whether he understands what he reads and writes.

*George W. White*, the only witness examined on the part of the defendant, proves, that he first became acquainted with the mines in May 1850, when he was employed by Wilson to take charge of them; when he came to the mines they were partly filled with water, and it was at least seven months before they were cleared; that Wilson's working the mines, at the time he commenced to do so, was a mere experiment, without any visible evidence that they would become profitable; that before the monthly yield was sufficient to pay the monthly expenses Wilson must have been out of pocket at least $10,000 for expenses in clearing the water out, machinery and other incidental and necessary expenses in working them, and in sinking shafts and driving cross-cuts through ground in which there was little or no ore; that he repeatedly conversed with Davis about the value and working of these mines, and Davis said, that he did not believe that any man could.make the mines meet expenses, that they had beggared him, and that he had lost some $1200 which he had brought there with him; that he knows *Michael O'Donnell*, and from his knowledge of his character for veracity, would not believe him on his oath.

On *cross-examination* he proved, that he called on Wilson for what was wanting at the mines, and Wilson furnished it; and that he called on Watts for nothing; that the real value of the mines, at the time he came, was not one dollar, in his opinion, and that he has stated, a short time since, that he was willing to swear they were not worth $5 at the time he went there to work; that he believes Wilson has derived profits from the mines, but he does not know how much.

After the testimony was taken, an amended and supplemental bill was filed, alleging, that agreement J, except the signature of Watts, is all in the handwriting of Wilson; that in November 1849, Wilson paid the mortgage debt according to said agreement, and on the same day wrote complainant

letter K; that agreement J was wholly drawn by Wilson, and was inequitably drawn by him for the purpose of setting it up or renouncing it, as might be most conducive to the fraudulent and dishonest purpose of cheating and defrauding complainant out of the mine and farm, which are the only means of subsistence to him, now experiencing the infirmities of age, and no longer able, by his personal exertions, to make a living for himself and family; that letter K was written by Wilson for the purpose of deceiving complainant, whom he knew to be easily deceived, and making him believe that no deed had been taken for the farm; that complainant subsequently discovered that Wilson had taken a deed from Taggart in entire fraud of this agreement, and of the confidence and trust reposed in him; that Wilson never told complainant that he had a deed for the farm, but, on the contrary, led him to suppose, by letter K, that no deed had been taken, and kept the same concealed from complainant, who never knew it till informed by his counsel; that at the time the mortgage debt of about $2100 was paid by Wilson, the mine and farm were worth at least $10,000, and at that time nearly $20,000 worth of ore had been sold from the mine by Tyson and Davis under their lease; that the mine and farm was not sold at public auction, according to the act of 1826, ch. 192, nor was there any advertisement made of the sale by the trustee according to that act; that reposing great confidence in Wilson, complainant signed the petition in the mortgage case, without benefit of counsel, or reading or knowing its contents or nature; that complainant is not a man of business or business habits, nor is he capable of understanding a paper of that description without the special aid of counsel, which, confiding in Wilson, he deemed unnecessary, nor had he the means of obtaining the same; that in signing that petition, and all other papers referred to by Wilson, and used in any way as exhibits, complainant had not counsel; that Wilson gave him no consideration whatever for signing paper P, nor for any other referred to by Wilson; that during the pendency of the suit between complainant and Tyson, and his other difficulties arising from his extreme poverty, Wilson pretended to be acting only as his friend, in saving

him from Tyson and his pecuniary troubles, and so stated to various persons; that Wilson has sold more than $25,000 of ore from the mines, and has, according to his own statement, made large profits out of the same, infinitely more than enough to pay said mortgage debt, interests and costs, and has refused to account. (The allegations of the bill of discovery are repeated in this amended bill.) The prayer of this bill is for an account under the direction of the court, and for an injunction against Wilson at the final hearing.

The *answer* to this bill admits, that agreement J is in Wilson's handwriting, but solemnly denies that he wrote it with a view to accomplish any fraudulent purpose upon the complainant, or any other person; denies that this agreement was ever fully executed by the parties named in it, the wife of Watts, one of the parties thereto, never signed or acknowledged it, besides respondent did not get possession of the mine and farm for a year from the date of this paper, and the agreement suggested by it was therefore never completed or executed, and therefore evidences no legal agreement between the parties named therein; that whatever legal effect this agreement might have had if the subsequent agreement P had not been executed, yet its force and effect, if any, are entirely merged in agreement P, executed more than three months afterwards, which agreement P, embodying the substance of the original mutilated paper No. 1, was ultimately perfected by the deed from Taggart; that about the 20th of November 1849, he paid the consideration before stipulated to be paid by him as the consideration or purchase money for the property, part of which was applied, as respondent was informed and believes, to the discharge of the mortgage debt, by the direction and request of Watts; that the deed from Taggart was executed in pursuance of the petition of Watts, and in conformity with the final contract stated in paper P; that Watts had able counsel, who filed his petition and acted for him as well as for respondent in the procurement of the deed, according to Watts' directions and authority; that Watts had ample time and opportunity to understand and fully comprehend the transactions by which he passed, and intended to pass, the title of the farm

Wilson *vs.* Watts.

and mine to respondent, upon payment of the purchase money as aforesaid; he utterly denies that in the procurement of this title he used or practiced any fraud whatever upon Watts, or made any misrepresentations whatever, and alleges that the purchase was made fairly and *bona fide* for what was then, in his opinion, a full consideration; that although propositions were made by respondent and Watts in regard to the purchase and working of the mines, yet none has been reduced to a contract except that set forth in Watts' petition, which was affirmed by paper P and evidenced by the deed from Taggart; he avers that no interference in the mines was ever made by Watts, nor any expenditure for working them charged to him, since respondent became the purchaser thereof as aforesaid, nor did Watts make any complaint in regard to this purchase until respondent, by the expenditure of a vast amount of capital at his own risk, brought them to a source of some profit, when he set up a false claim, alleging that he had been defrauded by respondent, which is utterly untrue; he again solemnly denies all fraudulent design, combination, misrepresentation or act in his purchase of this property, and avers that Watts often solicited him to purchase the same before he consented so to do; that his solicitor, Scott, filed his petition and acted in good faith in conformity with Watts' agreement with respondent; denies that he wrote letter K for the purpose of deceiving Watts or making him believe that no deed had been taken for the farm, and that he ever intended to deceive him, or that Watts is easily deceived in matters pertaining to his own business or rights, or that he was ignorant of the contents or meaning of the petition in the mortgage case, or that he was incapable of understanding the same, or destitute of counsel to aid him in comprehending it; he denies also the allegations that Watts is not a man of business or business habits, and avers that he has been a long time a justice of the peace of Baltimore county, and has discharged the active duties of that office, and has also been a judge of the district court of the 3rd election district of that county and performed the duties thereof; he avers that paper P was a confirmation of the original agreement between them, which was fully set forth in the

petition, to which they are both bound by their consent filed in the mortgage case, but as respondent, at the date of said paper, had not received his deed from Taggart, he asked for and obtained that written evidence from Watts of his title to the farm, to be used at the trial between himself and Davis, and for any other fair and honest purpose, and submits that it does not now lie in the mouth of Watts to repudiate the obligation of an instrument which he says he executed only to be used in a trial against another; denies that he has made large profits from the mine, but admits that he refuses to account to Watts in respect to his mining operations, because Watts has no right or interest, and has never invested a dollar in them; he relies upon the statute of frauds as a bar to the relief sought by this amended bill, and as an answer to any alleged agreement or contract touching said land. He also denies the allegations contained in the bill of discovery, and refers to his answer to the same, which was filed at the same time with his answer to this amended bill.

It was agreed, that the evidence taken under the original bill and answer, might be used at the hearing under the amended or supplemental bill and answer, subject to all legal exceptions. The proceedings which were commenced in the Superior Court were then, by consent, transferred to the Circuit Court of Baltimore city.

Exceptions were then filed to the sufficiency of the averments of the bills, original and amended, in substance as follows:

1st. For that whereas the bill, among other things, prays that defendant may be required to deed back to Watts the mine and farm, or such interest therein as by agreement J he should appear to be entitled to, yet that agreement does not show that Wilson entered into any contract with Watts to deed back the mine and farm, or any interest in either of them, either upon the hypothesis that Wilson had, or in the event he should thereafter, become the owner of the entire property by purchase or otherwise.

2nd. For that whilst Watts admits that he made the declarations and admissions, to be found in the record, of the mortgage case of *Hook vs. Watts,* and does not pretend that he

did not knowingly make the same, yet he seeks in pleading by averments to contradict the same, to ascribe to them meanings and effects contrary to their plain meaning and operation, and in fact to vary them by averment of agreements or assurances made, or understandings, or confidences, or trusts, or intentions, or purposes of a directly contrary import. The defendant therefore excepts to these averments:—1st. Because the complainant is not at liberty to give to said admissions and declarations, meanings and effects contrary to their true meaning and effect. 2nd. Because no averment can be made by complainant to contradict said record. 3rd. Because if these admissions and declarations were untrue in fact, the same were a fraud upon the court in which they were made, and on all persons whose rights were, or were liable to be, affected thereby, and that complainant is estopped to aver the contrary thereof.

3rd. For that whilst complainant pretends that other conveyances were intended to be made between him and Wilson, he does not set forth and show what such conveyances were, nor whether such intention was based on any and what agreement, or whether such conveyances were to be as qualifications or as modifications to any and what particular conveyance.

4th. That Watts, in now seeking to destroy and impair, or otherwise affect the deed from Taggart, really affirms and shows, that he was guilty of gross fraud upon others in the various transactions which he pretends to have taken place, and thus, by his own showing, has no standing for relief in this court.

5th. That the bills are very vague, indefinite and uncertain, in their statements and averments.

6th. That whilst the complainant is seeking the specific performance of an illegal, executory, parol, contract, denied by the answers, he does not set forth and show with any certainty what the precise contract is, nor aver and show any acts of part performance, nor does he tender performance.

7th. That whilst complainant charges fraud in no sparing terms, yet at the same time he admits that the contracts entered into by him were knowingly made and entered into, and pre-

cisely import what they were intended to import, so that the imputations of fraud are to the effect that the same are used in fraud of some conventional agreement, which it is the object of the bill to enforce a specific performance of, yet such agreement is not set forth and stated in pleading.

The defendant also excepted to the testimony, as follows:

1st. To all parol testimony tending to contradict, add to or vary the written evidence of the contracts and agreements, made between the parties in relation to the property mentioned in the bill.

2nd. To all testimony which tends to show a state of case different from, or inconsistent with, the state of case presented to the court by the record of the mortgage case of *Hook vs. Watts.*

3rd. To all testimony which relates to matters not within the scope of the bills, nor warranted by their statements and averments.

4th. To all testimony which relates to any matters not pertinent to the case as made in pleading by the bills.

5th. To all testimony tending to prove by parol any conventional trust, or to connect by parol any written papers in the cause for the purpose of establishing any trust, confidence or agreement, by such papers so connected.

6th. To all testimony tending to show a fraudulent use by defendant of any agreement, deed, or other document.

7th. To all testimony tending to contradict or impair the efficacy of the order of Baltimore county court, passed the 20th of November 1849, as shown by the record of the case of *Hook vs. Watts.*

8th. To the admission in evidence of letter K, and especially to its admission as any evidence of any trust as respects the deed from Taggart, or as respects the title acquired under the contract evidenced by the petition, and the agreement for the ratification of the sale in said case of *Hook vs. Watts.*

It was agreed that these exceptions should have the same effect as if the testimony excepted to was particularly set forth in them, and the cause was then argued and submitted for decision.

The court (KREBS, J.) delivered a lengthy and elaborate opinion in the case, in which—after stating the allegations of the bills and answers, and referring to the proceedings and decree of the court in the case of *Hook vs. Watts*, and stating that they bind Watts so as to transfer the title of the property, unless their validity is impaired by some of those influences operating upon him from the party who seeks to avail himself of their benefit, or circumstances of weakness of mind and inadequacy of consideration, which courts of equity have declared destroy the effect of the most solem acts of parties, and judgments and decrees of courts—proceeds:

"It is the peculiar duty of a court of equity to protect the rights and interests of persons of weak understanding and feeble judgment, and who are disabled by distress of mind, arising from pecuniary troubles, or overwhelming calamities, from properly managing and disposing of their property. And among the numerous classes of cases in which they afford relief are those in which unconscientious advantages or bargains have been obtained from persons disqualified by weakness, infirmity, age or other incapacity, from taking due care of or protecting their own rights or interests. 1 *Story's Eq.*, *sec.* 221. And this is upon the theory of the law, that there must be a free and full consent of parties to the acts and contracts affecting their property and rights, to make such acts and contracts binding. Consent is an act of reason accompanied with deliberation, the mind weighing the good and evil on each side. And hence it is, that if consent is obtained by surprize or undue influence, it is not the deliberate and free act of the mind. *Secs.* 221, 222. Weakness of understanding constitutes a most material ingredient in the inquiry, whether a contract or deed has been obtained by any imposition or undue influence, 'for although if these be made by a man of sound mind and fair understanding, they may not be set aside merely from being rash, improvident, or a hard bargain, yet if they be made with a person of weak understanding, there does arise a natural inference that they were obtained by circumvention or undue influence.' *Sec.* 235. And the same learned judge says, 'if a person is of feeble understanding, and the bargain is

unconscionable, what better proof can one wish of its having been .obtained by fraud or imposition, or undue influence, or by the power of the strong over the weak? *Sec.* 236, and the .authorities there cited. By this weakness of intellect, the learned author does not mean that imbecility of mind which would justify the court's protecting power under a commission of lunacy, for in *sec.* 237, he quotes the language of the Lord Chancellor, .in the case of *Blackford vs. Christian,* 1 *Knapp,* 78, 'a degree of weakness far below that which would justify such a proceeding, coupled with other circumstances, to show that the weakness, such as it was, has been taken advantage of, will be sufficient to set aside any important deeds.'

"And he further says, 'that the doctrine may be laid down as generally true, that the acts and contracts of persons who are of weak understandings, and are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion, that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning or artifice, or undue influence.' *Sec.* 238. 2 *H. & J.,* 285, *Brogden vs. Walker.*

"Another class of inequitable and unconscientious bargains, are those described by Lord Hardwicke in *Chesterfield vs. Jaussen,* 2 *Ves., Sen.,* 155, in which he says, 'courts of equity have an undoubted jurisdiction to relieve where the unfairness is apparent from the intrinsic nature and subject of the bargain itself, such as no man in his senses and not under delusion would make.'

"There is also another class of cases in which relief is constantly granted, in which, to inadequacy of price or inequality in the bargain, is superadded other circumstances of a suspicious nature. *Story's Eq., secs.* 244, 246. As for example, to use the language of the Chancellor in *Copis vs. Middleton,* 2 *Madd. Ch. Rep.,* 568, 'where the transaction is such as to be inconsistent with the sober manner of a man's transacting his affairs,' there, he says, 'inadequacy of price is strong evidence of fraud.' By inadequacy of price in this passage he does not mean 'gross inadequacy, which shocks the conscience,' for he had already declared, in the preceding part of his decision, that

it alone, without superadded circumstances, would invalidate the transaction. And it is perfectly well settled, that the weakness of mind in the party to the transaction, that influences the courts in their decisions in the foregoing classes of cases, is not that which arises only from general mental imbecility, the natural incapacity of infancy, or the infirmity of old age, but it is immaterial whether it proceed from such causes, or 'from those accidental depressions which result from sudden fear or constitutional despondency, or overwhelming calamities,' (1 *Story's Eq.*, sec. 234,) 'from extreme necessity or distress,' *sec.* 239, or such like causes, that 'harass and perplex the intellect and render a man uneasy at the time,' so that 'it cannot be supposed that he had a mind adequate to the business which he was about.' *Sec.* 234. 5 *Blackf.*, 530.

"There is also that extensive class of cases in which courts of equity are accustomed to exercise a most plenary jurisdiction for relief, denominated constructive frauds, by which are meant such acts or contracts as, although not originating in any design to perpetrate a positive fraud, yet by their tendency to deceive or mislead others, or to violate confidence reposed, are deemed equally reprehensible, and are prohibited by law as within the same reason and mischief. Some of the cases under this head grow out of special, confidential, or fiduciary relations between all the parties, or between some of them, which are watched with especial jealousy and solicitude, because they afford the power and means of taking undue advantage, or of exercising undue influence over others. Courts of equity therefore interfere in such cases, where but for such a peculiar relation they would either abstain wholly from granting relief, or would grant it in a very modified and abstemious manner. And they act upon the principle which is sometimes called a 'technical morality.' If confidence is 'reposed, it must be faithfully acted on and preserved from any intermixture of imposition. If influence is acquired, it must be kept free from the taint of selfish interests and cunning over-reaching bargains. If the means of personal control are given, they must always be restrained to purposes of good faith and personal good. 1 *Story's Eq.*, sec. 308. Courts of

Wilson *vs.* Watts.

equity will not set aside a contract merely because a man of a high sense of honor would not have entered into it; but some relation between the parties must exist, which compels the one to abstain from 'all selfish projects.' They will not suffer one party standing in a situation of which he can avail himself against the other, to derive advantage from that circumstance. 'The general principle which governs in all cases of this sort is, that if confidence is reposed, and that confidence is abused, they will grant relief.' *Sec.* 308. The familiar relations to which these principles have been invariably applied, are those of attorney, or solicitor and client, principal and agent, &c., &c.; but the courts have long since extended them beyond these technical relations to apply to "cases of persons standing in the situation of confidential advisers,' *sec.* 319; or confidentially entrusted with the management of the concerns of another, in whom he reposed a very 'special confidence,' *Hunter vs. Atkins,* 3 *Mylne & Keene,* 113; and to all cases where confidence is reposed, and one party has it in his power, for his own advantage, to sacrifice those interests which he is, in conscience, bound to support.' 1 *Jeremy's Eq.,* 396. The law upon this point, as now adopted and constantly acted on by the courts of England and this country, together with the authorities to sustain it, is fully set forth by the court in the case of *McCormick vs. Malin,* 5 *Blackf.,* 509. In that case the court says, 'there was no formal relation between the parties of principal and agent at the time of the sale, but the one reposed a confidence in the other as undoubting, and was liable to an influence as powerful, as if that relation had subsisted; the rule in equity applicable to all such cases where confidence on the one hand and influence on the other exist, from whatever cause they may spring, requires of the party, in whom the trust is reposed, the highest degree of good faith. On him rests the duty of proving that the contract is in every respect equal, fair and equitable; if he fails in this, it is a case of constructive fraud and avoids the contract,' page 523, and the authorities there cited, also page 527. Lord Eldon in *Gibson vs. Jeyes,* 6 *Ves.* 277, in reference to the principle of the rule, that in transactions and dealings between attorney

and client, in regard to the property of the latter, the onus lies upon the attorney of showing that no undue advantage has been taken, says, 'that it is found in that great rule of the court, that he who bargains in a matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence, a rule applicable to trustees, attorneys, or any one else;' a rule as Story says, 'applying to all persons standing in confidential relations with each other;' and which he says is this, viz., 'it is not necessary to establish that there has been fraud or imposition upon the client, but the burthen of establishing the perfect fairness, adequacy and equity' of the transaction or bargain 'is thrown upon the attorney.' 1 *Story's Eq.*, sec. 311.

"From the foregoing we deduce the positions: 1st, that courts of equity will set aside deeds or contracts of a man of weak understanding, not equal to the task of attending to his own interests with deliberate judgment, where the bargain on which it is founded is hard and unreasonable, and the consideration inadequate. 2nd. Of a man of good understanding, and under ordinary circumstances competent to manage his affairs with a due regard to his interest, where the deed, contract or bargain is between himself and another, in whom he places confidence and relies on to guard and protect his interest, and where the consideration is not perfectly fair, adequate and equitable; and *a fortiori* will such deed or contract be set aside, where the circumstances of weakness of judgment, inadequacy of consideration, and confidential relation, combine to impeach the transaction.

"Before examining the evidence to ascertain how far these principles apply to the facts in the case, let us glance at the species of property involved in this controversy. We find it was a tract of land in Baltimore county, not far from the city, which, not so valuable as many other lands for agricultural purposes, yet concealed, under its less favored soil, rich stores of mineral wealth, undeveloped treasures of copper ore;—that kind of treasure which, as we are told by high authority, when a man discovers that it is to be found in his neighbor's field, he goes and sells all that he has that he may make himself

the owner of it; that description of property to which a man clings with the tenacity of forlorn hope, and which, of course, Watts was very desirous to retain in his possession.   With all this Mr. Wilson was perfectly well acquainted; and he knew further, that Watts was poor, and that this property was 'his main dependence.'

"It cannot be doubted, from the direct testimony of the witnesses examined upon that point, that Watts was a man of very feeble capacity for business and pecuniary transactions. McConkey says, that 'Watts is not a man of business habits,' that he is not 'calculated to transact business in which there is any financiering.'   Rider says, that 'he really thinks that Watts is not a man of business;' and to the defendant's cross-interrogatory the witness replies, 'that he does not think Watts is a man of ordinary understanding, competent to make contracts, and that he would not trust him to make a contract for him.'   The former of these witnesses speaks from a knowledge of Watts for thirty, and the latter for many years. Hook, who says that he has known him for twenty years, testified to the same effect.   There is nothing brought out on the cross-examination of these witnesses, that shows that they speak from prejudice or ill-will against him, or that impairs their testimony, and the defendant has not produced a single witness to rebut what they have stated upon this point.   All that he has relied upon, by way of answer to these charges, to weakness of mind and incompetency, is what he alleges in his answer, and what is stated by Watts' own witnesses upon the defendant's cross-examination, viz., that Watts has acted as a county justice of the peace, and that he was one of the associate justices of the 3rd election district of Baltimore county.   But Rider and Hook, upon whom the defendant relies for the proof of these facts, say, the former, that he never thought him fit 'to be a justice of the peace,' that 'he had seen some of his official acts, he doubted whether he understood what he had written, he has written pieces which deponent thinks he, Watts, did not understand;' and the latter, 'that Watts was one of the associate justices with him of the said district court, that he sat at said court two or three times, but took no active

part in its business;' and that he is not able to say, 'whether he, (Watts,) understands what he reads and writes.'

"This very fact of Watts' deficiency as a man of business, and incompetency to contract with skill and judgment, was put prominently in issue in the pleadings, and the defendant has not met it by such evidence as satisfies the court, in view of what the complainant's witnesses testify, that Watts was not a very simple-minded man, of feeble intellect, of limited capacity for business, and not possessed of sufficient ability to qualify him to bargain and contract, with reference to the property in question, with that degree of judgment and delibe-ration which courts of equity deem necessary to render such transactions valid. And this seems to be the estimate that Wilson himself formed of Watts' qualifications to manage his business affairs, and to deal with this property; for giving the former credit for sincerity in the sympathy that he manifested for Watts, and the reason he assigned for his willingness to be-friend him, he certainly did not believe him competent to pro-tect himself from being cheated and defrauded out of this property, for Davis, one of the witnesses for the complainant, says, that Wilson told him that 'he felt a disposition to be-friend Watts, to prevent him from being cheated and defraud-ed by Isaac Tyson,' who was supposed by Wilson to have some designs upon these copper mines, and who he said 'was endeavoring to wrong Watts and to get the mines for less than their value.' And when Watts went to Tyson's counting-room to offer these mines to him, Wilson came with him as his 'counsellor' and friend, apparently not willing to trust him to negotiate, without his aid, with Tyson; and he appears to have gone in the same character to the office of Stewart, who had written two notes to Watts, requesting an interview with him in regard to these mines, and who, instead of calling himself, is represented by Wilson. And when Stewart says that he is a friend of Watts, and wished to promote some satis-factory arrangement with Tyson, Wilson's reply proves clearly, that he did not regard Watts as equal to the task of taking care of his own interests and protecting himself from imposi-tion. He says, 'No such arrangement could be made, . . . . .

Tyson wanted to take advantage of Watts, and that he intended to protect Watts from imposition, and that he should not sacrifice' these mines; language highly creditable to his friendly and sympathetic feelings for Watts, but still the language of the stronger towards the weaker; the language of one who is confident of his powers to protect and defend the interests of another, who is not competent to guard and preserve them himself. The letters addressed, from time to time, by Wilson to Watts, and filed with the evidence, contain cautions and charges to Watts to 'keep cool, not to brag or talk too much,' to be on his guard 'how he talked and who he talked to,' and encouragements 'not to be frightened and afraid,' all in regard to this property, which, if they mean anything, show conclusively, that Wilson regarded Watts as a weak and incompetent man, to be addressed and cautioned almost like a child, and altogether unfit, without assistance, to manage and transact his business affairs. If he was not the man of inferiority of intellect, feebleness of mind, and unfitness for his business, that all the circumstances of this case, and the testimony of these witnesses, who have known him for so many years, prove that he was, why has not the defendant produced other persons, who have known him equally well, to prove that he was a sound-minded, shrewd man, skilful and expert in matters of business, and perfectly competent to attend to and take care of his own interest? It certainly was not enough, in answer to the evidence in the cause, upon this point, to rely upon the simple fact that he had acted as a justice of the peace in the county or in the district court, especially when the witnesses who proved these facts, rebut the inferences therefrom, of capacity and qualification, by saying, that he was, in their opinion, not fit for the office.

"And again, at the times of these transactions between Watts and Wilson, beginning with the earliest, the contract of April 25th, 1846, Watts was poor and in great pecuniary distress; this Bare Hill farm and mine, his only means of support for himself and family, had been advertised for sale to pay Hook's mortgage claim, and he was evidently in that state of uneasiness of mind, perplexity and embarrassment,

which the courts, in the language of the authorities referred to, regard as 'overwhelming calamities' that 'harass and perplex the intellect, and render a man uneasy at the time, .... so that it cannot be supposed that he had a mind adequate to the business that he was about.'

"Such being the character of his mind, both from natural and accidental causes, what does he do? He encounters, in a business transaction of the deepest moment to himself, a gentleman whose keenness, shrewdness, and business qualifications and capacity, no one who knows him will question. That transaction was an agreement to sell on the part of Watts, and to purchase on the part of Wilson, the Bare Hill farm and copper mine. Wilson disavows any other view of it than this; the contract, he alleges, is set out by Watts in his petition, in the case of *Hook vs. Watts*, filed on the 27th of April 1846. He also alleges, that exhibit No. 1, filed with his answer, dated the 25th of April 1846, evidences this contract. What was the consideration to be paid by him for this property? Exhibit No. 1 says, that it was 'the payment of the sum of money due under mortgage to Hook.' The petition says it was $2100, which Wilson, in his answer, says, was more than sufficient to pay the mortgage, interest and costs; and which, by the auditor's account, it did exceed by the sum of $15.66. Was not this contract with this man, such as he seems to have been from the evidence, of such a character as courts of equity discountenance and set aside as being hard, unconscionable, unreasonable, and not founded on a fair, adequate and equitable consideration? Was not Watts 'sacrificed' by this sale? To show that he was, it is not necessary to refer to the testimony of the different witnesses in regard to the value of this property, because Wilson's letter to Watts, of the 9th of April 1846, is sufficient for the purpose. That letter was written after the property had been first advertised under the mortgage by Taggart, and before the day of sale had arrived, and it appears from it, that Wilson had called on Taggart and 'handed him a note, signed by Hook, to stop the advertisement,' which he declined doing before he saw Hook. Wilson then says in this letter, 'from what I

saw of Mr. Hook I don't think he is disposed to injure you further than to secure his money. . . . . If he, (Hook,) will come in with you on Saturday, I will go with him and you to Taggart and save you from sacrifice.' What is meant here by Watts being 'injured' and 'sacrificed?' Certainly nothing else but having this property sold to pay this mortgage debt. It was then advertised for sale, and it was the sale that was to 'injure' and 'sacrifice' him, and why? because it was all his living, and he would be left destitute without it, and it was evidently supposed to be worth much more than the mortgage claim. If Watts would have been 'injured' and 'sacrificed' if his property had been sold to any one else for this mortgage debt, does he not suffer as much if it is sold to Wilson for the same consideration? Does he 'save Watts from sacrifice,' as he kindly offered to do, by taking this same property on these terms?—and that too after he had interfered and stopped the public sale—which no doubt would have brought its fair value—and purchasing it at private sale?

"Mr. Stewart, in his testimony, says, 'that Wilson spoke of the said mineral lands as being very valuable; . . . . . that they were Watts' main dependence, and that there was no chance of his arranging with Tyson for them, for anything like a fair value.' This took place, as Stewart says, in 1847, but there is nothing in the evidence to show that anything had been done to render the mines more valuable then than they were in 1846, at the time when Wilson alleges he made the purchase. And it appears from the evidence of the agent of Tyson, (Farquharson,) that in the spring or summer of 1846, he offered Watts $4000 for the mineral right of this property, he reserving to himself one-fifteenth of the ore, which he refused, replying that he had made other arrangements. There can be no doubt, from all the circumstances of the case, that Wilson knew of this offer at the time he had the conversation with Stewart above mentioned; and if 'there was no chance of arranging for anything like a fair value,' with a person who had made such an offer for this property, as Wilson said there was not, he certainly meant, at that time, to intimate that it was worth a great deal more than that amount. In

addition to the evidence of the value of this property, furnished by the declarations and statements of Wilson, there is a great preponderance of testimony in favor of the conclusion, that it was of great value, and that the consideration mentioned in the said agreement, was by no means fair and adequate.

"But there is, superadded to the foregoing view, the relation of friendly agency and proffered aid, and kindly intercession and interference, to protect and relieve Watts in his difficulties and embarrassment in regard to this property, and to save it from sale and sacrifice, and from being obtained from him by cheating and defrauding him, which Wilson had established between Watts and himself, and which disables him from purchasing this property unless for a fair, adequate and equitable consideration, and throws the whole burden of proving that the consideration was of this character upon him. The court is of opinion, that all the principles that govern courts of equity in their decisions in cases of bargains, transactions of buying and selling, &c., between persons standing in fiduciary and confidential relations to each other, apply to this case. It differs very little, if at all, from the case of attorney and client. Wilson chose to place himself in the position of attorney in regard to this matter of the advertisement and sale of Watts' property under Hook's mortgage. It was a business requiring the services of an attorney or some such agent, and Wilson proffers these services. We do not find from the evidence that Watts ever consulted or employed a lawyer in reference to this matter, or that Wilson advised him to do so, or called in the aid of one until the proceedings were commenced to consummate his alleged purchase, by procuring a deed for him from Taggart, and then Wilson's attorney is employed for that purpose.

"This Bare Hill property was advertised on the 31st of March 1846, by the attorney of Hook, for sale on the 23rd of April ensuing, upon the *ex parte* proceeding authorised by the mortgage act of 1826. It does not appear in the case that Watts had any attorney at this time representing his interest in connection with this property- If he had wished to delay the sale or make other arrangements in reference to the case,

his first step would have been to employ counsel. At this stage of the matter we first find Wilson connected with it as the friend, counsellor and protector of Watts, performing those very acts that his attorney and most generous friend would have done to prevent the property from being sold and sacrificed. From Wilson's letter of the 9th of April 1846, when the advertisement of the sale was in the papers, which is the earliest definite date in regard to his connection with this matter, we find that on Sunday previous Hook had agreed to an arrangement, 'under which (as Wilson says) he will be double safe,' which was doubtless his offer mentioned by Hook in his testimony, 'to take up the mortgage and give his, Wilson's, notes, at one, two and three years, for the amount.' That in consequence of this arrangement Hook had signed 'a note to Taggart to stop the advertisement,' which was delivered to Wilson, and by him handed to Taggart, who refused to discontinue the advertisement; Wilson, in his letter, then says, that he did not think that Hook was disposed to injure Watts, and that if Hook would come in with Watts and call at his, 'Wilson's, store, he would satisfy Hook about Watts' security, and go with Hook and Watts to Taggart and save Watts from sacrifice.' Hook, in his testimony, says, that Wilson came over where he was, at his brother's, and offered to take up the claim against Watts' property by giving his own notes for the amount, that he took him to be Watts' friend in the interview, because he made the above offer and was willing 'to take the debt of Watts on himself.' Wilson, in his answer, admits, that he did agree to give his notes for that purpose, but that they were ultimately declined, 'and the property was advertised for sale.' Taggart says, that Wilson called at his office, as he understood, as the 'friend of Watts,' and offered his, Wilson's, notes for the whole amount of the mortgage debt, which he, Taggart, declined. Tyson says, that Watts and Wilson 'called together at the counting house of the former, Wilson appeared to be the counsellor and friend of Watts, he, (Tyson,) so considered him at the time. They called to know what he would give for that part of the Bare Hill farm where the mines were and which had been leased to Davis.'

" It is to be observed, that all this occurred before the alleged contract of sale exhibit No. 1, dated 25th of April 1846, and before Watts' petition stating the contract, dated the 27th of the same month, and that there is no intimation from Wilson in anything said or done by him up to the former date, nor any circumstance from which it can be inferred that he was himself in treaty for the purchase of the property, or looked to becoming the owner of it.   What he had offered to do was to save it 'from sacrifice,' to protect Watts from injury, to assist him in keeping his property, which Wilson said to Stewart 'was his main dependence,' even offering his own notes, (not 'having the money,' as he stated to Taggart,) for the whole mortgage debt, to stop the advertisement and prevent the sale. At this time Watts could have regarded him in no other character than that of his best friend, his counsellor, his confidential adviser, his agent, apparently ready and willing to do anything in his power to befriend and assist him in his distressed condition, and to save his property from sale and sacrifice.   This being the relation in which these parties stood to each other, Watts must have placed the utmost confidence in Wilson, and he must have had unbounded influence over him.   No stronger proof of such confidence and influence could be adduced than the fact that Watts, (as alleged by Wilson,) signed the contract of sale of the 25th of April 1846, written by him without any legal adviser, to Watts, a circumstance always regarded as suspicious, in which, for the consideration of the mortgage debt only, to be paid by Wilson, he agrees to sell to Wilson the whole of this Bare Hill property, 'with the right of his mother's life estate, also to be conveyed to said Wilson.'   Now this life estate was not embraced in the mortgage to Hook of course; without it he says he 'was satisfied' with the property 'as security,' and 'that in April 1846, it was worth a good deal more than the amount of this mortgage debt,' whilst other witnesses speak of it as being of very great value.   From the foregoing facts it is not unreasonable to conclude, that Wilson's influence over Watts was such that he would have signed almost any paper, in reference to this property, that Wilson might have written and offered to him; and that under this

Wilson *vs.* Watts.

influence and with unquestioning confidence in him, he, Watts, signed the petition prepared by Wilson's solicitor, which he no doubt understood to be intended for the mere purpose of procuring the title for Wilson, in pursuance of this alleged contract of sale, in regard to the consideration for which he would have made no more inquiries than he would, if he had been called upon to prepare a deed of it for these parties. In fact he had nothing to do with the negotiations or arrangements that led to this alleged contract, and cannot be supposed to have known what was in the mind of the parties in regard to it. The testimony of another witness, not yet referred to, is very strong to show the relation of friendly agency and protecting care that Wilson had assumed towards Watts, and the opinion that Wilson entertained of the great value of this property. I have looked carefully through the whole evidence and find no attempt made to impeach the testimony of this witness. He states that Wilson stated to him, 'that he was the friend of Watts, and that he merely would undertake this thing to get him out of the clutches of Tyson and of Davis, who were both, as Wilson said, trying to rob Watts out of his house and home; that the mine was invaluable, there was no telling the amount of money it was worth; that he would not take any amount of money for it if he was Watts; that it would turn out to be a fortune for him; that if he was Watts he would not let Tyson have it for any consideration, and this was said in the presence and hearing of Watts.' All this is inconsistent with the fact that the property then belonged to Wilson, of which he says he became the owner by the contract with Watts of April 25th, 1846, and the contract set forth in his petition of the 27th of the same month, before mentioned, and of course these statements and declarations were made by Wilson before that time, and they define, in his own language, the relation he had assumed in reference to Watts over this property, and show that he had determined to use his influence with Watts to prevent Tyson from becoming the purchaser for any price, and sustain Watts' allegation in the bill, which Wilson does not deny in his answer, 'that he frequently dissuaded him (Watts) from making a bargain with Tyson,'

and this is especially important in view of the facts in proof, that he was exceedingly anxious to get the property, and had actually offered $4000 for it, which Watts declined, because he had made other arrangements. Conceding that it was difficult, from the nature of this property, to say what it was worth, with much precision, at the time Wilson alleges Watts contracted to sell it to him, or what might have been obtained for it at private sale, we find a definite offer of $4000 made for it— the opinion of many persons, competent to judge, that it was of great value—Wilson's statements that it was very valuable— and Watts deprived of the benefit of that great test of the fair value of his property, a sale at public auction, where Tyson, who Wilson says, ought not to have had it for any consideration, would have been a competitor for it with others. And we find such a sale actually advertised, stopped by the agency of Wilson, 'to save,' as he says, 'Watts from sacrifice,' and Wilson, as he alleges, becoming the purchaser at private sale for about $16 more than the mortgage debt, interests and costs, $2100, when no public sale was threatened, as the evidence of Taggart shows. If the inadequacy of this consideration is not, in the language of some of the decisions, 'sufficient to shock the conscience,' the whole circumstances of the transaction certainly produce that effect, and the court is constrained to say that it cannot sustain this contract with Watts, and regard it as any foundation for a valid title to this property in Wilson.

"It will be found from a review of the authorities, that upon the objections of incompetency and inadequacy of consideration, the proofs in this case are much stronger than the rule established by those authorities requires. In *Gibson vs. Jeyes*, 6 *Ves.*, 272, in which the two objections just mentioned, coupled with the relation of the parties, were urged against the contract, Lord Eldon says, looking to the third ground, the relation of the parties, 'there is enough in this case to authorise the court to say, there is probable evidence of incompetency, and evidence of some degree of insufficiency of consideration that can be felt as extremely material evidence, when it is to be connected with the third ground.' In *McCor-*

*mick vs. Malin,* 5 *Blackf.,* 531, the court, after considering the several grounds for setting aside the contract in that case, that have been relied upon in this, closes its examination in the following language, precisely applicable to the case before this court: 'If it could be doubted whether any of the views that we have taken, separately considered, is sufficient to entitle the complainant to the relief he prays, that doubt must vanish before their combined force. A treaty respecting an important interest, entered into between two persons of very unequal powers, one with a naturally unsound judgment, the other enterprizing, keen and sagacious in business, the weaker mind trusting in the stronger, that influence increased by pecuniary distress on the one side and pecuniary power on the other, and resulting in a contract exhibiting great inadequacy of consideration:—A treaty thus characterised, presents claims to relief which a court of equity cannot withstand.'

"If this case then stood upon the contract of sale alone, as alleged by defendant in his exhibit No. 1, or as set forth in Watts' petition, the court would have no difficulty in relieving against it. But the defendant relies in vindication of his title, not only upon this contract of sale, but also 'upon the orders of Baltimore county court, in the said case, ratifying and confirming said sale, and upon the deed from Taggart in pursuance thereof,' which, deriving its effect solely from the validity of said order or decree, as it has been termed in the argument of counsel, must stand or fall with the said decree.

"This order was passed by the court on the 20th of November 1849, more than three years after the alleged contracts of sale; and was passed with the written consent of Watts filed in the case, without which, for several reasons, it would have been a nullity. The defendant claims for this decree a very impregnable character, and insists that Watts cannot gainsay it, or aver anything against it. Now it is perfectly certain, from all the authorities, that all the facts, circumstances and reasons that have been previously considered, and which it is unnecessary to recapitulate here as objections to the validity of the said contract of sale, can be relied upon against the validity of this decree. It is assailable upon the same grounds and for

51 v.9

the same reasons. If a decree has been improperly obtained it can be impeached, *Mitford's Ch. Plead., by Jeremy*, 112; and when made by consent, and the consent has been fraudulently obtained. *Ibid.*, 114. 1 *Story's Eq.*, sec. 252. 2 *Do.*, sec. 1522. *Bradish vs. Gee, Amb.*, 229. *Monell vs. Lawrence*, 12 *Johns. Rep.*, 521. But for the opposition of Tyson to Watts' petition, as shown in the proceedings in the said case of *Hook vs. Watts*, the record of which is one of the exhibits in this case, this decree would no doubt have promptly followed the petition, and having been in company with it would have shared its fate, so far as that fate is determined by the views and reasonings hereinbefore expressed and urged, upon the law and facts in this case; but does the circumstance of Watts having assented to this decree, and its having been passed by the court so long subsequently to the contract of sale, give to the decree any force, effect or validity, which the contract does not possess? It certainly does not, because all the evidence in the cause shows, that the previous condition of Watts, and the relation of Wilson to him, was unchanged at the time of the decree; nay, that the circumstances of their relative position were such at that time, as to make the objections to the validity of this decree, for the reasons heretofore stated, stronger than those that could be urged for setting aside the contract of sale. Whilst there is much in the testimony of the witnesses in this case to maintain this position, there is quite enough, for that purpose, to be culled from Wilson's letters to Watts, written during the interval between the contract and the decree. They are expressed in language of the warmest apparent friendship, manifesting the deepest concern for his interest in connection with this property—show that he seemed to be acting for him, and his interests, in reference to pending law suits with Tyson—congratulate him on successful results of this litigation, both in the court of chancery and in the appellate court—address him now in terms of admonition, 'not to brag too much, . . . . . not to talk too much, . . . . . be cautious who you talk to;'—and then, in terms of encouragement, exciting his hopes of great gain and benefit to be derived from these mines, in words such as these, 'plenty of money ahead,

Wilson *vs.* Watts.

only have patience, . . . . . only keep cool and look sharp, the money will come sooner or later in no small sums,'—all showing that Watts still had the strongest reasons for regarding him as his best friend—his confidential adviser, employing his agency in every way to promote Watts' interests in connection with this property, and excluding any doubt of his enjoying the entire confidence of Watts and having the strongest influence over him, and there is nothing in the case to furnish any reason for believing that Watts was at that time more competent to attend to his interest in this business than he was when he signed the contract of sale, and nothing having been added to the price of the property, it was quite as inadequate as a fair and equitable consideration.    The question, as to the effect of subsequent acts and deeds of parties in ratifying and confirming contracts liable to be impeached on the grounds alleged against his contract, has been fully considered in the elaborate opinion of the court, in the case of *Butler et al. vs. Haskell,* 4 *Desauss. Eq. Rep.*, 651, 709, in which the judge, delivering the opinion, says: 'I understand the doctrine, as to confirmations, to be quite settled, that the party who gives them must be shown to be no longer under those circumstances of necessity, or of overbearing influence or blind confidence which led into the first agreement, and that he is aware that he is not bound by the original contract, but may be released from it; but nevertheless he choses deliberately and without imposition to confirm what he had first done.    To this may be added, that in many cases, particularly of great abuses of confidence, confirmations are not allowed to have any effect;' and on page 715: 'The few cases in which confirmations have been allowed to prevail, have been cases of great fairness and deliberation, where very intelligent men, fully aware of their rights and of their title to relief, have nevertheless thought proper to confirm contracts impeachable in their character; and this,˙after the necessity which led to the first bad bargain had ceased.'    In *Purcell vs. McNamara,* 14 *Ves.*, 91, it was decided by Lord Eldon, and afterwards by Lord Chancellor Erskine, that 'several deeds executed at large intervals should not prevail as confirmations, the other party being throughout under the same influence,

control and ignorance of their rights, and every instrument signed under the same blind confidence.' The case above cited, of *Butler vs. Haskell,* was similar to the case before the court, in respect to the reasons urged against the validity of the deed in that case sought to be vacated; they were inadequacy of price, the weakness and necessities of the sellers, and the relation of confidence between them and the purchaser; upon which grounds the deeds were all set aside, as well the original as the confirmatory, and it is a strong authority upon all these points. I am constrained therefore to say, that I regard this order of court, or decree, and the deed made in pursuance of it, as having no more validity or effect than the contract of sale.

"It appearing then to the court, from all the evidence in the case, that this order or decree which the defendant alleges is in pursuance of and carries out this contract, is impeachable, and liable to be set aside and vacated for the various reasons above stated, we are brought to the question: Whether the complainant in his pleadings has set forth a case to which this state of facts will adapt itself?

"It is an elementary rule of pleading that a complainant's relief must be according to his allegations, and that where he seeks relief against a decree upon such grounds as would constrain a court of equity to vacate it, he must sufficiently allege these grounds, and must also bring to the view of the court in his bill of complaint the particular decree or proceedings that he seeks to impeach, and it is not enough for him to take up the decree when pleaded or relied upon by the defendant, object to it, and ask to be relieved against it, he must make it the substantive matter of impeachment in his bill of complaint. *Story,* in his *Equity Pleading,* after stating that there is no doubt of the jurisdiction of courts of equity to grant relief against a decree where it has been obtained by fraud and imposition, which infect judgments at law and decrees of all courts and annul the whole in the consideration of courts of equity, prescribes the frame of a bill to set aside a decree upon the above grounds in these words: 'A bill to set aside a decree for fraud must state the decree and the proceedings which led to it, with the circumstances of fraud or whatever may be the ground on which it is impeached,' *sec.* 428.

"The original and amended bill filed in this cause, although not drawn very skilfully, yet are very full in the statements and repetition of the matter on which the complainant relies for relief. They set forth this petition, proceedings, and order, or decree of the court, with the various grounds of objection that the evidence shows in the opinion of the court he is entitled to urge against them, viz: his ignorance, unfitness for business and incompetency—the inadequacy of the consideration, and the relation which the defendant had assumed and stood towards the complainant; the unlimited trust and confidence that he reposed in the former, and the influence that he acquired and exercised over the complainant; and concludes with an alternative prayer for relief, looking to a favorable view of the case by the court in this aspect of it. The court must therefore declare its conviction, that the facts and circumstances averred in the bills of complaint are sufficient to entitle the complainant to relief upon the grounds heretofore considered in this opinion. The court has given much examination, thought and reflection, to the principles, authorities and reasonings that have brought it to the judgment already declared upon this transaction between the complainant and defendant, regarded as a purchase, because the defendant has thought proper to rest his defence exclusively upon that view of the case, and it is constrained to say that regarding it in that character, it cannot, consistent with the well settled principles that regulate courts of equity in like cases, regard this transaction in any or all of its parts as giving a fair, valid and honest title to the defendant.

"Having considered this case in the aspect of it presented by the defendant in his answers, I will proceed to examine it in another view, presented by the complainant in his original bill, in which he alleges that the agreement set forth in the petition filed in the case of *Hook vs. Watts*, and the confessions made by him in that case, and to be found in the chancery record referred to, were not made for the purpose of conveying the absolute legal title in the Bare Hill mines and property to the said Wilson, but only for the purpose of making him safe in the payment of the mortgage debt, until other conveyances

were made between him and Wilson, accurately defining and limiting his right and interest in the mine. The court will then enquire:

"1. Whether it appears from evidence that it was the intention and understanding of Watts and Wilson that this agreement, proceedings and deed, should not convey the absolute title and ownership in this property to Wilson?

"2. Whether it sufficiently appears from the evidence, what interest and estate they were to have in the said property under the agreement and proceedings?

"3. Whether the rules of law and decisions of the court of equity prevent this court from carrying out the intention of the parties in reference to such interest and estate, as it may be disclosed by the evidence?

"It may be premised upon the first question, that a sale of this property to any one was the very thing that Watts was struggling to avoid, and the calamity that Wilson seemed desirous to avert, because it was Watts' 'main dependence' and he did not wish 'to be sacrificed.' Again, if the transactions between Watts and Wilson were designed to make the latter the owner of this property; if he was to become the purchaser under a sale from Watts, is it not marvellous that not a single witness is produced who heard, at any time during the long interval between its commencement and consummation, one word between these parties in regard to the sale or purchase of this property, and that not a single line is exhibited in evidence written by Watts to Wilson, nor one from the latter to the former, in the course of the correspondence that is proved to have passed during this interval, in which the subject of a sale is mentioned or referred to, or from which any inference can be drawn to prove that Watts regarded Wilson as the owner of this property? And further, Watts had, just before the alleged agreement to sell to Wilson for $2100, refused Tyson's offer of $4000 for this property; no doubt, from the evidence, acting with the knowledge and advice of Wilson himself, and there was no pressing necessity at that time for a sale of these mines. Though Watts had failed to make, through Wilson, the arrangement proposed

and assented to by Hook for time, in the payment of the mortgage debt, yet Taggart had discontinued the advertisement of the property and had abandoned the sale for the time being. In his answer, filed on the 4th of May 1846, to Watts' petition, of 27th of April preceding, setting forth, as alleged, this contract of sale, which answer is a part of the record in the case of *Hook vs. Watts,* made evidence by the defendant, he, (Taggart,) says, 'that he has no intention at this time to foreclose the said mortgage by a sale of the said property; that he had no instructions to do so from the mortgagee and assignee, or either of them, and he denies that the petitioner has any right to insist that the mortgagee shall proceed under the mortgage, or to ask the order for a sale, prayed by him.' Is it not most surprising that Watts, under these circumstances, should at that time have entertained the idea of selling this property to Wilson, and for the price which he alleges was paid by him for it? If he meant to give up his title to it absolutely by this seeming contract of sale, his act is scarcely consistent with sanity. It appears to the court that the mystery in which this part of the case is veiled, is at once removed by correctly understanding the real position of Tyson and Wilson to this property at this time. It is perfectly manifest that there was a struggle between them in regard to it. Watts, in his bill, alleges, 'that Wilson was anxious to prevent Tyson from obtaining it.' Wilson does not deny this in his answer, and the evidence shows that the allegation is true. Hook, as early as 1843, had lent Watts $1657 on a mortgage of this property— he had paid no interest on it. Hook says he was satisfied with the security—the property was worth a 'good deal' more than the amount of the mortgage debt, but that 'he wanted the interest of his money so that he could make use of it.' And some time before the 6th of October 1853, had placed the claim in the hands of his attorney, Taggart, with authority to him to sue for it; for we find that on that day Taggart, as attorney for Hook, agreed to assign to Tyson the whole of the said mortgage claim absolutely, upon the payment by him within two years of the whole sum due and owing by Watts, with interest and commissions, after the payment of $700, on

that day paid by Tyson, who purchased the mortgage debt to protect his interest in the mortgaged property, which being created subsequently to the date of the mortgage, he was advised was liable to be destroyed by a foreclosure of the mortgage. Notwithstanding this money was paid to Hook, who says he 'wanted the interest' only, and Tyson had two years to pay the balance, and therefore had control of the mortgage claim and proceedings to foreclosure during that period, we nevertheless find the property advertised for sale the 31st of March ensuing, by Taggart, to satisfy this mortgage debt, which suggests the natural inference that Tyson's plan of protecting his interests looked to a sale of the property—a purpose which Wilson seemed to have suspected when he wrote his letter to Watts of the 9th of April 1846, to which he adds, by way of postscript, 'our arrangement with Hook, (which was to give Wilson's notes, &c.,) may not suit other parties who have had arrangement with Taggart.' Taggart refused to stop the advertisement, as we have already seen. Watts, in his bill of complaint, alleges, that Wilson then agreed with him to buy in the property on the day of sale and intimated it to Davis, who informed Tyson, and he induced Taggart to stop the sale. This statement is not denied by Wilson in his answer, and I find strong circumstances in the case to prove that this must have been so. It is certain that the sale at auction was stopped, and that both Taggart and Tyson resisted the private sale to Wilson—Tyson protesting, in his answer to Watts' petition, that it was an attempt to give Wilson the advantage of a purchaser under the mortgage, and to give him a preference over the respondent, (Tyson.) It seems to me perfectly manifest, that these parties were striving, each to prevent the other from getting this property, and that the grand object that Watts and Wilson had in view was, by address and management, to defeat Tyson in his plans for acquiring it. This was, no doubt, the purpose of the petition, &c., not to settle the terms of an absolute sale by Watts to Wilson. For though the arrangement took the form of a sale to him for a consideration that paid more than the mortgage debt, as Wilson says, yet it was conceded in the argument that the

Wilson *vs.* Watts.

surplus had never yet been paid to Watts. But looking to the conduct and admissions of Wilson in reference to this property, it appears to the court, that if human acts and language mean what they plainly import, he could not have regarded himself as the owner of this property to the exclusion of any interest, joint or otherwise, with Watts, as he now asserts. His letters to Watts, filed by him as exhibits, beginning from the earliest in date, 9th of April 1846, to the time when the deed from Taggart was executed, contain language and expressions, some of which have been already quoted, and others that will be discovered by a mere glance at the correspondence, which are utterly inconsistent with the theory, that Watts had no interest in the mines; such as no man ever wrote to another about property that did not belong to him in any sense, and all this after, as he, Wilson, says, he had purchased it from Watts, long before these letters were written. But this is the tone and language not only of Wilson's letters to Watts, before he signed exhibit P, on which the defendant relies with so much assurance to prove his ownership of the property, and before the execution of the deed from Taggart, but after the date of both these instruments, his written communication shows more definitely than any former one that the writings previously executed did not secure to him the title to this property, according to their agreement. In that letter, dated on the day on which he paid the mortgage debt, when the deed was executed, November 22nd, 1849, he says, 'the business of the mortgage has been settled and paid off to-day,'— strange language to be used by one who had paid the purchase money for property which he had bought and which had just been conveyed to him;—'we expect you will be in to-morrow morning, as it will be necessary for you to deed one-half of Bare Hill to me, according to our agreement.' The defendant admits in his answer that this letter, which is filed as exhibit K, is in his handwriting. The allegations in the bill in regard to it are, 'that in the month of November 1849, your orator received a letter from said Wilson, marked as above mentioned, stating that said mortgage had been paid and settled, and that your orator must come to town and give him a deed for one-

half of Bare Hill, according to agreement. That your orator then came to town and told said Wilson that your orator's wife was sick and could not come to town, but that if said Wilson would draw up a deed your orator should sign it in the country, and said Wilson assented thereto, but no deed was ever sent out by said Wilson; that said Wilson subsequently stated to your orator, that he had determined to charter said mine and your orator and he could settle then,' but that no company was formed and he never settled with him.

"All that the defendant says in his answer to the allegations in the foregoing extract is, that these letters, filed as exhibits with the bill, evidence no such private contract or secret agreement as is alleged by the complainant, and that nothing contained in letter K, or any other exhibit filed in the cause, can impair his title to Bare Hill farm; he takes no further notice of this very important document; he gives no explanation of its meaning, notwithstanding it mentions an agreement; he does not say that there was not any agreement whatever in existence to which it referred, he only states that it, with the other exhibits, evidence no such private contract or secret agreement, as the complainant alleged: but though it evidenced no such agreements as these, it might have evidenced or referred to an agreement of another character—a subsisting written agreement, for instance, between these parties. It is to be observed, that in immediate connection with the foregoing allegations in the bill, and preceding them in the statement, is the allegation that said Wilson signed another agreement drawn in his handwriting, exhibit J, and which is the contract for the sale of one-half of Bare Hill farm to Wilson. Now the complainant evidently means, though he does not so state expressly, that this was the agreement to which this letter referred, and though this letter mentions an agreement, and the complainant sets forth and insists upon this agreement J as a subsisting agreement, the defendant does not deny that 'this is the agreement to which this letter refers.' This letter certainly proves two facts:—1st. That the deed from Taggart, executed the day before the date of the letter, the alleged basis of the defendant's right to this property, did not settle the title

to it between these parties, but that Watts and wife were to give Wilson a deed of one-half of it, according to agreement. 2nd. That there was at the time this letter was written a subsisting, unexecuted agreement on the part of Watts and wife to convey one-half of it to Wilson.

"But, independently of the admissions and statements in these letters from Watts, both before and after the deed from Taggart, to prove that these previous transactions were not meant to convey this title absolutely to Wilson, we have the unanswered and uncontradicted statement in Watts' bill, that in consequence of this letter he came to town, and told Wilson that his (Watts') wife was sick and could not come to town, but that if Wilson would draw up a deed they would sign it in the country, and that Wilson assented to this arrangement. Now here is the distinct allegation, that Wilson agreed to have a deed for one-half of Bare Hill farm drawn and send it to the country to be executed by Watts and wife; a careful perusal of the defendant's answers shows, that he has not answered these important averments, either by admission or denial. There is no doubt that it is the privilege of the defendant to refuse to answer any important allegation in the complainant's bill, and that such refusal does not dispense with the necessity of proving the fact alleged, but it raises a suspicion against him and has some influence upon the decision of the cause. *McDowell vs. Goldsmith*, 2 *Md. Ch. Dec.*, 387. *Joice vs. Taylor*, 6 *G. & J.*, 54. It appears therefore to the court incontrovertible, that it was the understanding of these parties that these transactions between them in regard to this property did not vest the absolute title to it in Wilson.

"What interest and estate then were they to have in this property? Watts alleges that Wilson was to hold it as security for the mortgage debt, which he agreed to pay, until other conveyances were made between them, accurately defining and limiting the right and interest of Wilson; this is denied by him. But we find that as late as the 15th of February 1849, after Wilson had purchased, as he says, which was in April 1846, he writes the paper J, which sets forth that Watts and wife had sold the one-half of it only to Wilson. Which paper

contains this significant clause, 'in the event that G. B. Wilson raises a stock company, or can sell the whole tract for a handsome remuneration, to mutual advantage and benefit of both parties equally concerned, then the parties hereto are respectively bound to such an arrangement, their heirs and assigns;' this paper is signed by Watts and Wilson.

"It is to be specially noted here, that Watts' petition, stating the sale to Wilson, on which he relies as the origin of his title, was filed on the 27th of April 1846; the agreement J, above mentioned, was drawn by him and signed by himself and Watts, on the 15th of February 1849, nearly three years after the date of the former. There was no act or proceedings on the part of either of them, in the case of *Hook vs. Watts,* nor does the evidence show that any other agreement between them, in regard to this property, was executed in the interval.

"So that in the progress of their transaction, they seemed to have abandoned the contract of April 1846, for a sale of the whole to Wilson, and adopted one altogether different—a contract for the sale of half to him; or rather, is not this instrument of writing, of February 1849, in the handwriting of Wilson himself, irresistible proof, that at the time it was executed there was truth in the allegation of the bill, that the proceedings in the said case were not intended to vest any absolute title in Wilson, but that their interest was to be defined by subsequent writings, and that this was the writing by which they then thought proper to define it? I can see no other conceivable theory with which this act can be reconciled. If this position be established, the case is relieved of all difficulty growing out of the fact that Watts may have subsequently executed or assented to writings or acts designed to place the legal title in Wilson, and especially out of the fact that he assented to the subsequent ratification of the sale in the course of said proceedings, for this was only carrying out the original design of the parties and the apparent purpose for which these proceedings were instituted, viz., to convey the title to Wilson, which Taggart had refused to do without an order of court.

"It is very important to keep this agreement J steadily in

view, and to watch the progress of events between these parties, to ascertain whether it has been annulled by any subsequent agreement, or is inoperative for any other reason. That it existed in full force and showed the mind of the parties, on the 15th of February 1849, cannot be questioned. The defendant's answer in regard to this agreement is, that it never went into effect, because from the day of its date to that of the deed from Taggart, Davis held possession of the property, so far as related to the copper mine, against him, (Wilson,) and against his own release and assignment thereof to him. The court is at a loss to discover any force in this reason, or to understand how the fact, that Davis, who had assigned all the interest he had in this property to Wilson, and refused to deliver possession to him, could affect Watts' rights under this agreement. At the time it was drawn by Wilson and executed by Watts and him, he knew that Davis was in possession, and, according to Davis' testimony, he and Wilson worked it together for about a month, early in the year 1849—this agreement being executed about that time. It was in fact subject to whatever interest Davis had in the premises, and Wilson undertook to procure that interest by assignment from him; and we find nothing in the evidence showing that Wilson made any complaint about this state of things. In his answer to the supplemental bill, he adds some further reason for regarding this agreement as inoperative. He says it was never fully executed by the parties thereto—'the wife of Watts, one of the parties, never signed or acknowledged it;' and further answering he maintains, 'that whatever legal effect it might have been entitled to, yet the force and effect thereof was entirely merged in defendant's exhibit P, filed with the testimony.' Now in regard to these additional reasons, though not in form of, they are in fact amendments to, the answer to the original bill, and suggesting as they do new matter of defence in the knowledge and possession of the defendant when that answer was framed, if they had any intrinsic force it would be very much weakened by that circumstance. Courts of equity are exceedingly slow and reluctant in allowing a defendant to amend an answer in material facts or to change essentially the

grounds taken in the original answer, and this reluctance is only overcome by very cogent circumstances, and such as repel the notion that the party is attempting to evade the justice of the case or to set up new and ingeniously contrived defences or subterfuges. *Smith vs. Babcock*, 3 *Sumner*, 583. If paper J had anything very serious to apprehend from paper P, the objections just mentioned could be urged against it with great force. Paper P, first introduced into the case as a document filed by the defendant under the commission to take testimony, and which he insists merges agreement J, was executed by Watts on the 1st of June 1849, more than three months, as the defendant alleges, after the date of the former. The original writing from which it was copied by Watts, exhibit AWB, was like all the other agreements in the cause signed by Watts, prepared by Wilson in his own handwriting—a circumstance relied upon in the adjudged cases as convincing proof of overpowering influence and implicit confidence. Wilson, to show the nature and effect of this exhibit, says, that it 'embodies the substance of the original mutilated writing, exhibit No. 1' that the deed 'from Taggart was executed in conformity with the final contract stated in exhibit No. 1. That 'the contract of purchase set forth in Watts' petition was affirmed by paper P, and was a confirmation of that original agreement.' Now it is manifest, that paper P does not embody the substance of this mutilated writing, for that was a contract for the sale of 'the whole of Bare Hills, laid out for 90 acres,' and also the 'life-estate of Watts' mother.' Whilst paper P only professes to transfer all Watts' interest in the 'Bare Hill copper mines and the houses and improvements appurtenant thereto, with the reversion thereof as secured' to him. And for the same reason it cannot be pretended, that the deed from Taggart was excuted in conformity with paper P, or that it was a confirmation of the original agreement set out in Watts' petition, or that it affirmed that agreement, for they also embraced the whole of the property and not the copper mines only. This character and effect being ascribed to it by way of answer to Watts' allegation, that it was signed by him, at the request of Wilson, and for the sole purpose of

being used by him in a trial which was approaching between him and Davis, as he says, in regard 'to the possession of the Bare Hill copper mines;' and it being evident, upon carefully considering it, that it is entitled to no such character and effect, is not the conviction forced upon the mind, that it was signed by Watts for the purpose alleged by him, and with the same blind confidence in his supposed friend that he has evinced throughout the whole of these transactions, and that it could not have been intended to rescind agreement J, executed so short a time before, or to affect or impair the arrangement between him and Wilson, as settled by that paper? It does not speak of that paper or profess to touch it in any degree, and as to merging it, it certainly has not the capacity to merge the whole of it. It being then a fact that this trial was pending, and Wilson, for certain purposes known to himself or to his counsel, wanting it to be used at the trial, as he admits he did, and so stated to Watts when he desired him to sign it—is not the true history of it this? viz., that this trial gave it existence, especially when we find the author of it, Wilson, driven, as we have seen above, to such inconsistencies and far-fetched reasons to account for its existence in any other way. He did not want it as evidence of his purchase, for which purpose he says he procured it, because he had that, as he insists over and again in his answers, in Watts' petition, which, as he alleges, sets it forth fully. I think then it is perfectly manifest, that paper P was not designed to interfere with agreement J in any manner, much less to supersede or merge it. And have we not the written proof furnished at a subsequent date in Wilson's letter to Watts, on the 22nd of November following, nearly six months after that, agreement J was still in existence, not merged or cancelled by any thing that had been done by these parties? We search in vain amongst the facts in the case for any other agreement to which it can be understood to refer. It mentions an agreement, according to which Watts and wife were to convey one-half of Bare Hill to him, Wilson. This agreement provides for that very conveyance. It has been most earnestly urged by the solicitors for the defendant, that this letter K cannot be relied upon by the complainant to

prove any contract in reference to this land to bind the former. It certainly cannot be used to prove what that contract was. But it may be resorted to for the purpose of proving that a contract, such as it mentions, was then subsisting, just as their oral admissions might have been adduced for that purpose. But this would not have availed the complainant unless he could have gone further and traced out and produced the very contract or instrument of writing to which the defendant, in his letter, referred, and it appears to the court that this is beyond doubt the contract or agreement to which he had reference in that letter. In setting up paper P against this agreement J to merge and destroy it, the defendant insists, that the complainant is precluded from denying its efficacy as a transfer of the interest it describes and professes to convey, because he alleges that he gave it to Wilson for the sole purpose of being used by him in the trial with Davis; in other words, that Watts was giving Wilson the title for the temporary purposes of the trial, whilst, as the former asserts, the title was really in him, and thus he was joining with him in committing a fraud upon a court of justice, and therefore he cannot set it aside as inoperative and void. Now in reply to this objection it may be said, that according to Watts' theory, Wilson was to have the title to the property until conveyances were drawn defining and limiting distinctly their respective interest, and therefore, in signing this writing P, he was doing no more than conforming to the understanding between them, and he no doubt signed it the more readily when informed by Wilson that he wanted it to use it at this trial, presuming therefrom, and that very naturally, that as it was desired for that purpose it would not be used to interfere with agreement J, executed so short a time before by them.

"This court cannot view the conduct of Watts in this transaction in such a light as to insist upon the consequences of a deliberate and premeditated fraud upon the administration of justice, especially, when the party who asks for this sentence, is the individual who planned the fraud and led him into it, if it really be such. Wilson appears, undoubtedly, from what has heretofore been brought to view in this opinion, to have

exercised such a degree of influence over him, and to have had his confidence so completely, that he would, in all probability, have signed any paper that he might have presented to him. When this relation and state of things exist between parties, who are even *particeps criminis*, the law does not refuse to assist and relieve the party who has yielded to such influence. *Story* in 1 *Eq. Jur.*, sec. 300, says, 'where both parties are *in delicto*, concurring in an illegal act, it does not always follow that they stand *in pari delicto*, for there may be and often are, very different degrees in their guilt, one party may act under circumstances of oppression, hardship, undue influence, or great inequality of condition or age, so that his guilt may be far less in degree than that of his associate in guilt;' and he illustrates the distinction by reference to the case of usurious contracts, where the court will give no assistance to the lender, but do not hesitate to relieve the borrower against the usurious contract, although they are both *in delicto*.

"The objection just considered was attempted to be sustained by the solicitor of the defendant, by reference to the case of *The Phil., Wil. & Balto. Rail Road Co. vs. Howard,* 13 *How.,* 307. The question there was, whether a party defendant in a cause could repudiate an instrument of writing which he himself had set up in a former cause? The appeal to the Supreme Court of the United States was from the circuit court of Maryland. That court had instructed the jury in the case, 'that if the instrument of writing, the validity of the sealing of which the defendant denied, was produced in court and relied upon by it in an action brought against it by a certain party, and that said suit was decided against the plaintiff, upon the ground that this instrument was duly sealed by the said corporation as its deed, then the defendant in this case cannot be permitted to deny the validity of the said sealing, because such a defence would impute to the present defendant itself, a fraud upon the administration of justice.' The Supreme Court in deciding upon this point, say nothing in regard to the question whether this was a fraud or not, but use this language: 'Evidence that the corporation, through its counsel, had treated the instrument as bearing the corporate seal, was undoubtedly admissi-

ble, it tends to prove an admission by the corporation, that the instrument was sealed with its seal.' This court cannot say that any fraudulent use was made of this paper, in the trial between Wilson and Davis, much less can it say that the suit was decided against him upon the ground that Wilson held this writing executed by Watts. There is no allegation in the pleadings that this was so, nor any evidence on these points, and it therefore does not regard this exhibit as more of an estoppel against Watts than any writing in the cause executed by him. I am therefore satisfied that the interest and estate that these parties were to have in this property, does sufficiently appear from the evidence, and in fact that it is defined by the agreement J.

"Is there then any rule of law, or settled principle of equity, that prevents this court from settling and confirming, in these parties, the title to this property, such as it appears they were respectively to have in it? The solicitors for the defendant insist that there is. They aver that Wilson has the absolute title to it as purchaser, by virtue of the deed from Taggart and the proceedings that led thereto. They plant themselves upon this deed and rely upon it solely in vindication of their title, and have examined but one witness, and him chiefly in regard to his estimate of the value of these mines, in regard to which, his admissions have been so contradictory and inconsistent, that what he has stated in his testimony is entitled to no weight in a court of justice. They have not attempted to rebut or explain, by any testimony on the part of the defendant, the powerful and sometimes palpable deductions in opposition to their defence, arising from the varied testimony, written and oral, produced by the complainant. And this seems to be the position assumed by Wilson, himself, with this deed in his pocket when he told Keener, 'Watts has just such an interest as I please to let him have:' this, be it observed, was in reply to the most explicit assertion by Keener of Watts' interest in the property; and Keener's answer to this reply was, 'Not so, I have seen your written agreement as the purchaser of one-half only;' to which, it seems, Wilson made no answer.

"In a court of equity, however, the legal title—the title ab-

solute on the face of the deed and seemingly that of a purchaser—is not always conclusive proof of ownership. It may be, and often is, the mere foundation of trusts, which, whether they appear in the deed or not, may be shown to come within the class called constructive, resulting, or implied trusts, and which are deducible from the nature of the transaction as matter of clear intention, although not found in the words of the parties. 1 *Story's Eq.*, sec. 980. And in regard to the doctrines and distinctions that have been adopted in considering these cases of trust, there are many of them, as this learned author says, *sec.* 982, 'the creations of courts of equity acting upon the enlarged principles of social justice, *ex æquo et bono*, rather than express trusts created by the acts of the parties, or an exposition of their declared intentions.'

"'The court does not hesitate to declare its firm conviction, that in this class is the case before the court to be found. The evidence impresses upon the transactions between the parties in reference to this property, impliedly, constructively, and as necessarily resulting from them, the character of a trust. And that evidence is deemed altogether sufficient to meet the requirements of the statute of frauds, which has been relied upon by the defendant, in opposition to proof of any trust. For though it requires writing as evidence of the trust, yet, as *Story* says, *sec.* 972, 'it does not prescribe any particular form or solemnity in writing, nor that it should be under seal. Hence, any writing sufficiently evincive of a trust, as a letter, or any language in writing, clearly expressive of a trust, will create a trust by implication.' After a careful examination of the authorities, for the purpose of ascertaining the true rule of evidence adopted by courts of equity in such cases, I think I am not mistaken when I say it is this: wherever written evidence can be produced which is inconsistent with the fact, that the party who has obtained the absolute deed is the actual purchaser, further evidence is admissible to prove the truth of the transaction.

"In the case of *Leman vs. Whitley*, 4 *Russ.*, 423, the court treats this rule as well settled, and quotes Lord Eldon's language in *Cripps vs. Jee*, 4 *Brown's Ch. Rep.*, 472. 'This

written evidence being inconsistent with the fact, that the Rogers were the actual purchasers of the equity of redemption, further evidence was admissible to prove the truth of the transaction.' The court there remarks, 'unfortunately there is here no evidence in writing, which is inconsistent with the fact, that the father was the actual purchaser of the estate.' 2 *Story's Eq.,* sec. 1199, *note* 1. The chancellor, in the case of *Davis vs. Banks,* 3 *Md. Ch. Dec.,* 139, shows his estimate of circumstances inconsistent with the idea of a purchase, where the grantee relies upon his absolute deed. He says, 'there are circumstances in the case which repel the idea of a sale, and there is, besides, direct evidence of a character so strong, that, in my judgment, no reasonable doubt can be entertained upon the subject.' In the case before the court there are circumstances almost infinitely varied, and the strongest direct evidence in writing, under the hand of the defendant, utterly inconsistent with the fact of a sale to him, and that altogether repel the idea, that he was the purchaser and absolute owner of this property. In this case the complainant has produced abundant evidence in writing, under the hand of Wilson, to prove the facts upon which he relies. But if the testimony were not so full in this respect, he might, under the rule above referred to, having shown in writing that the transaction was not a purchase, resort to all the other evidence in the cause, oral or otherwise, to show precisely what it was intended to be. In *Cripps vs. Jee,* above referred to, the court says, 'it is clear from the written evidence, that the agreement really made between the parties was not that stated by the deed; will not that be sufficient to let in the parol evidence? Here is evidence from the parties themselves, that the transaction was not what the deed purports it to be; this introduces Hunt's evidence,' which was oral; this oral evidence is the further evidence referred to in the above case of *Leman vs. Whitley.* And this rule seems to have been so understood by the Court of Appeals of this State, in *Watkins vs. Stockett,* 6 *H. & J.,* 444, where the court says: 'Parol evidence is inadmissible to contradict a written instrument: except where fraud is charged, or in *cases of trust,* where, in order to

get at the real intention of a trust, for the sake of justice and equity, an enquiry will be permitted into the real merits of the case.' The views above expressed show, that the court is not embarrassed by the defendant's objections to the admissibility of the complainant's evidence, in opposition to the title or claim set up in contradiction of the terms of the deed from Taggart, nor by the exceptions taken to the frame and averments of the bill, in that, as the defendant avers, it seeks the specific performance of a contract which it does not set out. The court, in view of the magnitude of the interests involved in this controversy, the elaborate manner in which the case has been argued by the solicitors of the respective parties, the perplexing, intricate and involved character of the transactions between the parties, and the many very interesting and important questions of law and fact arising in the case, has given to it much patient investigation and deliberate reflection; in all which it has been actuated by a sincere desire to arrive at the justice and equity of the case, and to decide accordingly between the parties. If it had stood solely upon the ground assumed by the defendant, that he was the purchaser under the deed, entertaining the views expressed in a former part of this opinion, the court would not have hesitated to declare the deed, for such purpose, void; but, inasmuch as the case made by the complainant in the proceedings, shows a case, as this court believes, to which the rule, that 'he who asks equity must do equity,' applies, I shall therefore pass a decree directing the execution of such conveyances as may be necessary to settle the title to this property in these parties, upon the basis of agreement J, and refer the papers to the auditor, with instructions to the auditor to state an account of the net profits of the mine since Wilson has had possession of it, subsequently to the date of letter K, (out of which, however, I do not consider him entitled to be reimbursed his payments on account of the mortgage debt,) and the surplus equally divided; and pass such orders as may be necessary to do complete justice between these parties, upon the principles and views indicated in this opinion."

A decree was then passed, adjudging that Wilson held one-

half the lands conveyed by the deed from Taggart *in trust,* attaching simultaneously with the deed, to convey the same to Watts, in fee, with the right to all the crops to be raised on the whole of the lands by Watts, and directing him to make such conveyance forthwith; and further decreeing that Watts is entitled to one-half the net proceeds of all the minerals obtained by Wilson from these lands, since the date of said deed, and directing the auditor to state an account thereof.   An injunction was also granted restraining Wilson from selling or carrying away any copper ore heretofore mined by him, or which may now be on said lands, or may be hereafter mined thereon, until the further order of the court.

From this decree the defendant appealed.

The cause was argued before LE GRAND, C. J., ECCLE-STON and MASON, J.

*E. G. Kilbourn* and *Wm. Schley* for the appellant, argued :

1st. That the appellee cannot deny the title of the appellant to any portion of the estate purchased by him, under the sale ratified by the order or decree of the court in the case of *Hook vs. Watts,* because he is *estopped* by his petition signed and filed in that case, his written consent to the ratification of the sale, and the decree thereon, and no parol or written evidence can have the effect of adding to, altering or varying that decree. The proceedings in that case are *conclusive,* (2 *H. & G.,* 42, *Raborg vs. Hammond;* 5 *Gill,* 277, *Tomlinson vs. McKaig;* 2 *How.,* 58, *Shriver vs. Lynn;* 10 *Pet.,* 470, *Voorhees vs. Bank of the U. S.,*) and the appellee cannot be heard to make any *averment* against the *record* in that suit.   Watts went into court and averred that he had sold this mortgaged property to Wilson for $2100; the sale was reported upon *his petition;* its ratification was assented to *by him,* and the order ratifying it was passed *in consequence* of this assent.   Can he then be heard to make any averment against the *status shown by that record?*   His bill does not attempt to do so, and it cannot be done.   44 *Law Lib.,* 430, 435, 440, *Doe vs. Oliver.*   3 *East,* 346, *Outram vs. Morewood.*   Wilson would clearly be estopped

by these proceedings from saying that he did not *buy* the property, and is not Watts equally estopped from saying he had not *sold* it? Again, Watts is estopped upon grounds of *public policy*. He comes into court and defeats Tyson and Davis by giving ᐧWilson a title paramount to theirs, and now says that these proceedings were all *fraudulent*, that what he stated in his petition was all *false* and asks relief against his own acts, in which, if there was any fraud, he was clearly *particeps criminis*. Can he commit such a fraud as this upon the *administration of public justice* and then ask relief from its consequences? The case of the *Phil., Wil. & Balto. Rail Road Co. vs. Howard*, 13 *Pet.*, 324, 337, presents the very point in this case. If the claim now set up be valid, the act of Watts was a fraud upon Tyson, upon Davis, and upon the administration of justice. If Wilson be guilty, Watts is *particeps criminis*. *Nemo allegans suam turpitudinem est audiendus*, and it will not do to say that Wilson is equally guilty, for then the maxim,ᐧ*in pari delicto potior est conditio defendentis*, prevails. 6 *Gill*, 28, *Freeman vs. Sedwick*. Again, he is estopped by his acts and declarations *in pais*, inconsistent with the title now asserted by him, and inconsistent with the dictates of common honesty. 1 *Smith's Lead. Cases*, 446. He has acknowledged that the *whole premises* belong to Wilson, by issuing his warrant as justice of the peace against Davis, in which the premises are described as the property of Wilson, and by sitting in judgment in that very case as magistrate.

2nd. That a party voluntarily choosing to express himself in the language contained in a deed, or other written instrument, must be bound by it; and the proof in this case shows, that the petition and consent, above referred to, were voluntarily signed by Watts with a knowledge of their contents, and he cannot, therefore, be permitted to prove a different intent from that plainly declared in those instruments. 2 *Md. Rep.*, 25, *McElderry vs. Shipley*. 2 *H. & G.*, 34, *Lowry vs. Tiernan*. That Watts was competent to execute these papers, is proved by the very witnesses introduced to show his want of capacity and feebleness of intellect.

3rd. That paper P, the consent to the ratification of the

sale, and the decree upon it, *merged* all previous negotiations, including paper J, and, therefore, neither agreement J or any prior transactions can have an injurious influence upon Wilson's title under the sale by Taggart as trustee, and the deed from him in pursuance thereof.

4th. The above points, if decided in our favor, dispose of the case, but we have excepted to the sufficiency of the averments of the bill and the admissibility of the evidence, and now insist, that though the decree establishes, as against Wilson, a *trust* attaching simultaneously with the deed from Taggart, yet no such trust is averred in pleading or sustained by any competent evidence in the case. Agreement J does not prove any such trust. It obliges Watts and wife to convey one-half the farm *to Wilson*, and certainly does not look to the acquisition by Wilson of the title to the entirety of the farm, and a subsequent conveyance of one-half to Watts; its plain meaning cannot be added to or varied by parol, nor can any *parol* contract be set up in opposition to the statute of frauds. 1 *Gill*, 383, *Hall vs. Hall.* 7 *Ves.*, 211, *Woollam vs. Hearn.* 71 *Law Lib.*, 558, 574. 2 *Mylne & Keene*, 251, *Croome vs. Lediard.* 6 *H. & J.*, 252, *Lamborn vs. Watson. Ibid.*, 422, *Lamborn vs. Moore.* Letter K not being signed by Wilson, the party to be charged cannot be used as evidence of the alleged trust so as to control the deed from Taggart, and there is no such proof as will connect this letter with agreement J. 11 *G. & J.*, 314, *Moale vs. Buchanan.* 7 *G. & J.*, 157, *Maccubbin vs. Cromwell. Willis on Trustees*, 44. Whilst paper J proves, undoubtedly, a sale by Watts and wife to Wilson of only *one-half* of the farm, *at that time*, it certainly does not preclude the possibility of showing the acquisition by Wilson to the other half between its date and that of the deed from Taggart, and we insist, that the ownership of the entirety by Wilson is conclusively established by the acts and declarations of Watts, detailed in the evidence, and by paper P, and is not disproved by letter K, or any other competent evidence in the case. Again, the bill seeks specific performance, and in such case the *terms* of the agreement sought to be enforced must be set out with *certainty*, (3 *Ves.*, 420, *Walpole vs. Orford;*

Wilson *vs.* Watts.

2 *Md. Rep.*, 375, *Faringer vs. Ramsay;* 3 *Do.*, 490, *Ches. & Ohio Canal Co. vs. Young;* 2 *Story's Eq.*, secs. 764, 767,) and where specific performance is sought of a particular contract, (agreement J for instance,) no other contract not identical can be enforced. 1 *Johns. Ch. Rep.*, 132, *Phillips vs. Thompson.*

5th. But, apart from other considerations, the decree is erroneous in many particulars:—1st. Even if the alleged trust can be established, the decree is erroneous in not providing for the repayment by Watts to Wilson of the whole, or at least one-half, the amount paid in satisfaction of the mortgage. In the opinion of the court below the right to reimbursement is expressly denied. Now paper J certainly does not prove that the agreement to convey the one-half to Wilson was dependent on the future payment by him of the mortgage debt, costs, &c., and there is no proof to justify the conclusion, that the *consideration for the sale of the one-half mentioned in paper* J was the payment of the mortgage debt and costs. Even if Wilson is to be deemed as a purchaser of one-half, subject to existing incumbrances, the parties ought to contribute *pari passu* in discharging the incumbrances. 2nd. If Wilson's title is to be regarded as derived solely *by contract* with Watts, for one-half, and he acted merely as agent or in trust for Watts in obtaining the deed from Taggart, then, *even as to one-half,* Wilson is not owner as *purchaser* under the mortgage, and as between him and *Mrs. Watts* his half is liable to her potential right of dower. The decree, therefore, ought to have provided, as a condition to the relief granted, that whilst the interest of Wilson was reduced to a moiety in pursuance of agreement J, that the husband should procure the concurrence of the wife in conveying to him such half as expressly provided by that agreement. 3rd. The decree requires Wilson to account for all the net profits of the mines since the date of the deed from Taggart, (20th of November 1849,) whereas it is conceded that he acquired from Davis and Tyson the right to work the mines up to the 10th of July 1850, and the bill shows that he did work them before that time. The decree in this respect, therefore, is clearly erroneous.

54    v. 9

6th. As to the other objections: that in regard to *fraud* has been already answered,—the fraud is not sustained by the proof, and if there was any in the transactions Watts was *particeps criminis*. As to the *inadequacy of price:* there is, we insist, no proof of such inadequacy as to warrant the court to set aside the sale for this reason alone—the mines were not as valuable as supposed—Davis was completely *ruined* by working them—Tyson could have bought the whole at the time of the sale to Wilson for $3000, and would not give it. But it is said, that as the sale was a private one the court had no jurisdiction to pass the order ratifying it, as it did in the case of *Hook vs. Watts;* that the proceedings in that case were not in conformity with the act of 1826, and therefore the decree ratifying the sale was *coram non,* and is of no effect. To this we reply, that a decree of a court of equity can be impeached for fraud, but not *collaterally.* 2 *Md. Ch. Dec.,* 370, *McDowell vs. Goldsmith.* That if there are any irregularities they cannot affect the title under the decree; all that is necessary is, that the court passing it should have jurisdiction of the subject matter, (10 *G. & J.,* 183, *Comegys vs. The State; 5 Gill,* 275, 277, *Tomlinson vs. McKaig,*) and this they had in the present case, at least as soon as the sale was reported by the trustee, and when so reported, even though a private sale, the court had the power to ratify it upon *consent* of the parties in interest.

*John C. King* and *J. M. Campbell* for the appellee, argued:

1st. That the proceedings in the case of *Hook vs. Watts,* and the deed from Taggart, constitute no *estoppel* to the relief asked in this case. The *answer* of Wilson inflicts a fatal blow to his title under the act of 1826, for he says the sale was not made by the trustee as a sale under the decree and act of 1826, and that the deed was not executed as a deed by the trustee under the decree, but that the sale was made by Watts in pursuance of an agreement between the parties, and that the deed was executed under the same agreement, so that if there be *no valid agreement* there is *no valid deed.* The answer, therefore, tenders an issue upon matters *outside* of the

*record* in that case, and this is *fatal* to the plea of *estoppel.*
The deed professes to be given according to the act of 1826,
when, in reality, it was given in direct opposition to the terms
of that act, which requires a *public sale.* "A sale of property
in any other manner that that prescribed by law vests no title
in the vendee." 4 *Dana*, 179, *Campbell vs. Johnston.* "A
power of sale will be declared void for the slightest unfairness,
or anything that prevents competition." 3 *Gilman*, 42, *Long-
with vs. Butler.* The act of 1826 being special, any title
claimed by virtue of the act must be in strict conformity with
its provisions.

2nd. The answer having thus presented an issue outside of
the record in the case of *Hook vs. Watts,* the title of Wilson
must depend upon the contract set up in his answer, and if
that is struck down by *fraud,* the deed made in pursuance of
this contract *must fall with it.* The answer places the defend-
ant's title upon his exhibit No. 1, which he alleges was con-
summated in the deed. The *first* inquiry then is, whether
there *ever was* such a contract as this paper purports to set
forth? The answer swears to it, but there is no signature,
and Wilson says, in his answer, that Watts' *name,* not his
*signature,* has been torn or cut from it. Who tore or cut it
out? and for what purpose was it done? and when? The
attesting witness is not called, and his name is proved by
Keener not to be in his handwriting. It was a very easy
thing to have proved his signature if it was genuine. The
paper itself is wholly wanting in all the requisites of a valid
contract. It is produced by the *party pleading it,* it is in his
*own handwriting, mutilated,* and without any explanation for
its absence. And this is the paper which is to sweep from
Watts the entire fee-simple estate in his whole property, leaving
not a vestige of interest in him—a paper *mutilated,* with the
signature of the attesting witness *forged* upon it; nay more, a
paper which Wilson himself, by his numerous letters running
through the period of three years from its date, repudiates and
ignores, if there be in human language any meaning whatso-
ever. Each one of the ten letters from Wilson to Watts, all

dated subsequent to this pretended contract, gives the lie to its existence and stamps the answer with falsehood.

3rd. But suppose this paper once had an existence and the form of a legal contract, has it any *validity?* We · say none whatever. It is in the first place void of *mutuality*—Watts agrees to *sell* but Wilson does not agree to *pay.* But this contract is destroyed by the *confidential* relation between the parties. Before the court can examine any contract between them it must look to the relation in which they stood to each other, and this is the controlling question in this cause. Before examining the evidence let us see what the law is on this point. The general principle which governs all cases is, if *confidence* is reposed and that confidence is abused, equity will grant relief, (1 *Story's Eq.*, secs. 221 to 236, 308, 319; 3 *Mylne & Keene*, 113, *Hunter · vs. Atkins;* 5 *Blackf.*, 509, *McCormick vs. Malin;* 6 *Ves.*, 267, *Gibson vs. Jeyes*,) and it is not necessary to show *fraud* where confidence is reposed, (2 *Brown P. C.*, 183, *Stanhope vs. Toppe;* 2 *Gill*, 83, *Brooke vs. Berry*,) nor is it necessary that the relation should be a *formal one*, as that of attorney and client, guardian and ward, or trustee and *cestui que trust.* Now what was the relation of these parties at the time this alleged contract was entered into in 1846? The evidence clearly shows that Watts was poor and in very distressed circumstances; his property was mortgaged and about to be offered for sale to satisfy the debt; his whole means of subsistence was about to be taken from him; he was unaccustomed to business, his mind was weak and easily influenced. Under these circumstances he meets with Wilson, who came forward and proffered his assistance to *save* his property from *sacrifice;* he offered to take up the mortgage and went to Taggart to stop the sale; he openly acted and proclaimed himself the counsellor and friend of Watts, and avowed his determination to protect him. By these acts and proffers of friendly assistance he gained the confidence of Watts, who trusted him as his only and best friend. By these means he acquired an influence over the mind and will of this weak-minded, distressed man, such as the strong possess over the weak, the wealthy over the poor.

Watts trusted him and believed that through his assistance he should be saved from ruin, and his property redeemed from sacrifice.   Who can believe that under such circumstances a contract was deliberately made between these parties, by which the property of Watts was not only not prevented from being *sacrificed*, but was sold to Wilson for but a few dollars more than the mortgage debt?   And if it was. made, what court of equity would sustain and uphold it?   If this contract be valid, then the very thing Watts was endeavoring to prevent, and which Wilson promised his aid in accomplishing, was effected. So far from escaping a *sacrifice*, he was both *sacrificed* and *duped*.   Against such an abuse of confidence the law has wisely provided a remedy.   If a person is of feeble understanding and the bargain is unconscionable, what better proof can one wish of its having been obtained by fraud or undue influence, or by the power of the. strong over the weak.   1 *Story's Eq.*, secs. 221, 222, 235, 236.   This weakness need not amount to such as to require a commission of lunacy; a degree of weakness far below that, coupled with other circumstances, to show that the weakness, such as it was, was taken advantage of, will be sufficient to set aside any important deed. 1 *Story's Eq.*, sec. 237.  1 *Knapp*, 78, *Blackford vs. Christian.* 5 *Blackf.*, 530.   4 *Dessau. Eq. Rep.*, 651, *Butler vs. Haskell.* Parol proof may always be introduced to prove *fraud*, and this need not be done by direct proof, but it will be inferred from all the facts and circumstances of the case.   2 *H. & J.*, 288, *Brogden vs. Walker.*   2 *Gill*, 122, *Jones vs. Belt.*   *Ib.*, 98, *Brooke vs. Berry.*   The whole evidence in the case shows that there was this confidential relation between the parties, which Wilson has fraudulently availed himself of for his own advantage.

4th. Another ground on which this alleged contract is impeached, is the unfairness of the transaction or the inadequacy of price.   This contract, if it ever existed, is the most barefaced and unqualified *robbery* that was ever perpetrated since the beginning of time.   These mines were worth, in the opinions of the witnesses, from $6000 to $20,000.   Tyson offered $4000 for sixteen acres of the land, exclusive of one-fifteenth of the

ore raised from the mines. Wilson himself represents them in the hearing and presence of Watts as *invaluable,* says there is *no knowing what they are worth,* that they would be a *fortune* to Watts, and that they should not be sacrificed. The actual sales from the mines for two years exceeded $25,000, yet Wilson now says he purchased the whole property for $2100, a sum but little exceeding *one-half* what Tyson offered for sixteen acres of the land. Is this a contract that a prudent man would make? is it fair, just and reasonable? Where the transaction is such as to be inconsistent with the sober manner of a man's transacting his affairs, inadequacy of price is strong evidence of fraud. 1 *Story's Eq.*, secs. 244, 246. 2 *Madd. Ch. Rep.,* 568, *Copis vs. Middleton.* This is especially the case where one of the parties is laboring under distress. 1 *Story's Eq.,* secs. 234, 239. If it could be doubted whether any of the views taken, separately considered, is sufficient to entitle the complainant to the relief he prays, that doubt must vanish before this combined force. A treaty respecting an important interest, entered into between persons of very unequal powers, one with a naturally unsound judgment, the other enterprising, keen and sagacious in business, the weaker mind trusting in the stronger, that influence increased by pecuniary distress on the one side and pecuniary power on the other, and resulting in a contract exhibiting great inadequacy of consideration; a treaty thus characterised presents claims to relief which a court of equity cannot withstand. 5 *Blackf.,* 530; and to the same effect, 1 *Munf.,* 557, *Whitehorn vs. Hines.* 6 *H. & J.,* 445, *Watkins vs. Stockett.* 11 *G. & J.,* 1, *Glenn vs. Clapp.* 7 *G. & J.,* 157, *Macubbin vs. Cromwell.*

5th. But it is insisted, that paper P confirms and supports the title of Wilson under paper No. 1 and his deed. Wilson says it embodies the substance of the original mutilated agreement No. 1. But the truth is it does no such thing. Paper No. 1 was a contract for the sale of the whole property, including the life-estate of Watts' mother, whilst paper P only professes to convey Watts' interest in the property. But what is this paper P, and what effect is it to have? Though in Wilson's possession, it was not mentioned or relied on in his answer to the original bill. Every circumstance connected

with it only makes the fraud more glaring. No consideration was given for it. If Wilson had paper No. 1 in 1846, where was the necessity of executing another in 1849, to do exactly the *same thing* in a *less effective mode?* It is in Wilson's handwriting, brought by him to Watts, who merely acted as Wilson's *amanuensis* in copying it, and is tainted with the same defect as all other contracts between these parties.

6th. The contract, moreover, is in no way confirmed by the decree or order of the court in the case of *Hook vs. Watts*, ratifying the sale passed three years after the alleged contract of sale:—1st. Because all the facts and circumstances urged against the validity of the contract can be relied upon against the decree, and equity grants relief not only against deeds, writings and solemn assurances, but against judgments and decrees obtained by fraud and imposition;—a decree based upon a fraudulent contract is no better than the contract. 2 *Johns. Ch. Rep.*, 252, *Reigal vs. Wood. Mitf. Ch. Pl.*, 112, 114. 1 *Story's Eq.*, sec. 252. 2 *Do.*, sec. 1522. *Amb.*, 229, *Bradish vs. Gee.* 2nd. The same influence prevailed over Watts' mind at the passing of the decree as at the time of the contract. Several deeds executed at large intervals should not prevail as confirmations, the party being throughout under the same influence, control and ignorance of his rights, and every instrument signed under the same blind confidence. 14 *Ves.*, 91, *Purcell vs. McNamara.* 4 *Dessau.*, 651. 2 *Gill*, 107.

7th. We come then to consider what was the *true* agreement between these parties. This, we insist, was agreement J, which is conclusively affirmed by the letter of the 22nd of November 1849, from Wilson to Watts, written on the very day of the date of the deed from Taggart. It requests Watts to come in and deed to Wilson *one-half* of the Bare Hill farm *according to agreement.* This letter shows, that paper J was the true and real agreement between the parties, and is the basis of the relief which we ask and which was granted by the court below. It is true the letter of November 22nd, 1849, was not *signed* by Wilson, but it is admitted to be in his handwriting, and if not evidence of a *trust*, is still written evidence of what the contract between him and Watts *was.* We there-

fore submit, that the decree granting relief upon the basis of paper J should be affirmed.

The judges delivered separate opinions, CHIEF JUSTICE LE GRAND and JUSTICE MASON concurring in a reversal of the decree, and JUSTICE ECCLESTON dissenting.

ECCLESTON, J.:

Before looking into the evidence in this case, I will examine the principles, chiefly relied upon by the appellant, as grounds of objection to the correctness of the relief granted to the appellee by the decree appealed from.

1st. It is said the appellee cannot deny the title of the appellant to any portion of the estate purchased by him, under the sale ratified by the order or decree of the court, in the case of Hook against Watts, (the appellee,) because his petition, signed and filed in that case, his written consent to the ratification of the sale, and the decree thereon, will estop him. And no parol or written evidence can have the effect of adding to, altering or varying that decree.

2nd. That a party voluntarily choosing to express himself in the language contained in a deed, or other written instrument, must be bound by it. And the proof in this case shows, that the petition and consent above referred to were voluntarily signed by Watts with a knowledge of their contents. He therefore cannot be permitted to prove a different intent from that plainly declared in those instruments.

3rd. That the paper marked P, the consent to the ratification of the sale, and the decree upon it, merged all previous negotiations, including paper J. And therefore, neither agreement J or any prior transactions can have an injurious influence upon the appellant's title under the sale by Taggart, the trustee.

In the absence of fraud and mistake, these three positions contain sound legal principles; but no matter how closely the door may be shut and supposed to be securely locked for concealing fraudulent transactions, it may, nevertheless, be opened by the magic key of a court of equity, for the purpose of exposing to examination the illegal and inequitable instruments and acts intended to have been concealed.

A judgment or decree, based upon fraud or imposition, is no less subject to the control of a court of equity than a deed or other contract.

In *Hall & Wife, vs. Hall, et al.* 1 *Gill*, 391, Judge Dorsey says, "no principle is better settled, than that by no device or form of proceeding or solemnity of the instruments, or means used for its perpetration or concealment, can you deprive a court of equity of the power of 'unkennelling a fraud.' " See also page 387.

In *Pickett vs. Loggon,* 14 *Ves.,* 234, Lord Chancellor Eldon says: "As to the fine it has long been settled, that if a conveyance by lease and release, or bargain and sale, has been obtained by means which in this court have the character of imposition, fraud, oppression, or undue advantage, a fine constituting part of that assurance, which is so affected, whatever may be the effect at law, is no bar to relief in equity. The person deriving a title under it is a trustee, and the species of relief is by directing a reconveyance." See also *Bowles vs. Orr,* 1 *Young & Coll.,* 473, *(Exchequer in Equity.)* 1 *Madd. Ch.,* 300, and 5 *Gill,* 277, *Tomlinson, et al., vs. McKaig, et al.*

The appellant's counsel have relied, with much confidence, upon the second principle above stated, and seem to think it must entitle them to claim a reversal upon the authority of *Wesley vs. Thomas,* 6 *H. & J.,* 24, and *McElderry vs. Shipley, et al.,* 2 *Md. Rep.,* 25. In each of those cases, however, when the court announce that a party is to be bound by the language in which he voluntarily chooses to express himself in a deed, they mean, of course, such voluntary choice as the law considers a sufficiently free exercise of will to constitute the deed a valid instrument, in the absence of fraud; but they surely had no reference to a contract executed under an undue or fraudulent influence. An act done under an influence arising from misplaced confidence, will not, in a court of equity, be considered a voluntary act resulting from choice. 1 *Story's Eq.,* secs. 221, 222.

In the first case, at page 27, the court say: "It is most true that the court of chancery in the exercise of its moral jurisdic-

tion, as it has been emphatically termed, will upon the proof of fraud, mistake, or surprise, raise an equity, by which the agreement of the parties shall be rectified." The decision was made in 1823, and the complainant could have no relief on the ground of fraud, because the bill contained no allegation of fraud.

In *McElderry vs. Shipley, et al.,* the bill did not charge fraud previous to, or in the agreement; but that, since its execution, there was a fraudulent attempt to deprive the complainant of the benefit which it was the object of the agreement to secure. At page 35, the court say, "that parol evidence is inadmissible in a case like the present, to contradict, add to, or vary the terms of a written instrument; and although a court of chancery will, upon proof of fraud, mistake or surprise, raise an equity by which the agreement will be rectified according to the intent of the parties, it will not interfere where the instrument is such as the parties themselves designed it to be. For if they voluntarily choose to express themselves in the language of the deed, they must be bound by it." In support of which *Wesley vs. Thomas,* and other cases, are referred to.

An effort was made in *Watkins vs. Stockett,* 6 *H. & J.,* 435, to convert a deed, absolute on its face, into a mortgage. It appeared that, either by the grantor himself, or, in his presence, the conveyancer was particularly instructed to pass an absolute estate, and the court remark: "No room is left for the inference of circumvention or fraud. He transferred his estate with his eyes acknowledgedly open to the nature and quality of the estate which was transferred, and was intended to be transferred." Again, on page 445, it is said: "Indeed where fraud is charged, and the evidence establishes it, it has been remarked, that the statute of frauds may very properly be put out of the way, since the object of such evidence is not properly to contradict the instrument, but to raise an equity *de hors* the instrument, in contradiction of an intent which no law or statute will be suffered to assist or protect."

There no fraud was alleged, and consequently none could be proved, according to the determination in *Wesley vs. Thomas.*

It must be evident, that in the cases which have been noticed, when speaking of the binding effect of language in which a party "voluntarily chooses to express himself," in a deed, the courts had no intention to deny, or even to restrain in any degree, the well established authority of a court of equity to grant relief against a deed or other instrument obtained by fraud or circumvention.

The doctrine of merger, relied upon as the appellant's *third* ground of objection to the appellee's claim for relief, cannot be sustained, if paper P, the consent to the ratification of the sale, and the decree based upon it, can be shown to have been obtained by fraud or imposition.   Any other theory would exclude, in many cases, the best evidence of fraud. The last written agreement made between parties, will, in the absence of fraud, mistake or surprise, merge all prior negotiations, so that by them its terms cannot be contradicted, added to or varied.   But such prior negotiations will be admitted as evidence of fraud, mistake or surprise, when they tend to sustain an allegation of either.   In *Davis vs. Calvert, et al.,* 5 *G. & J.,* 303, upon issues sent from the orphans court, Ch. J. Buchanan said: "Fraud vitiates every thing with which it is connected.   A will or testament therefore, which is obtained by fraud, is void; and though fraud is never to be presumed, yet it is not necessary to prove it by positive and direct testimony.   But being usually wrapt up in mystery, if well concerted, it is generally by circumstances only, by inductions of particulars, some of them often apparently trivial, that it can be brought to light and defeated.   And in a question of fraud, any fact, no matter how slight, bearing at all on the point at issue, and not wholly irrelevant, may be admitted."   See also 1 *Knapp.,* 81.

In *Jones vs. Hardesty, et al.,* 10 *G. & J.,* 416, the appellant objected to oral evidence of an agreement, because there was a written contract, and the court say: "If the oral contract referred to had been reduced to writing by the parties, or if it was intended that the assignment should be such written contract of the parties, then might it be contended, in the absence of all proof of fraud, surprise or mistake, that the oral

evidence offered by the appellee was inadmissible." The ap-
pellant's objection was not sustained, because the court did
not consider that the parties had reduced their agreement to
writing. And it is a necessary inference, from the language
just quoted, that even if the agreement had been reduced to
writing, the parol evidence would not have been excluded, if it
tended to prove an allegation of fraud, surprise or mistake.
This principle is most explicitly announced in *Henderson vs.
Mayhew, et al.*, 2 *Gill*, 409. "Parol evidence," it is there
said, "is inadmissible to change or contradict the terms of a
written instrument. Strangers to the instrument, when autho-
rized to impeach or contradict it, may offer parol testimony for
that purpose; and so a grantor may, in a controversy with the
grantee, if he charges the same to have been obtained by
fraud or mistake." Here is a statement of the general rule
which forbids the use of parol evidence for the purpose of con-
tradicting or changing a written contract, but exceptions to the
rule are also stated, one of which admits even a party to the
instrument to impeach it by parol proof where fraud or mis-
take is alleged by him.

When there is a written contract in relation to land, and
some of the terms or provisions in the verbal agreement of the
parties are not included in the writing, but omitted by design,
even on the express understanding that such provisions should
be carried into effect in the same manner as if they had con-
stituted part of the written instrument, if there is no fraud,
undue influence, surprise or mistake, either in the making of
such contract or in reducing it to writing, parol evidence,
alone, will not be admitted to enforce the omitted provisions,
or for the purpose of contradicting, adding to or varying the
written instrument; although subsequently to its execution one
of the parties has fraudulently refused to comply with the
omitted provisions, and in open violation of good faith and
fair dealing, insists upon his right, under the statute of frauds,
to have the contract, as written, carried into effect. Such I
understand to be the law of Maryland.

But I have seen no case, in which it has been held that a
court of equity will refuse relief to a party of weak mind—even

though the weakness is not very great—harrassed with debt, having good reason to apprehend that nearly, if not quite, all the property he has, is about to be sold under a mortgage, without any means of his own to liquidate the debt, and who, thus situated, placing confidence in the ability, willingness and intention of a person offering his friendly assistance to prevent the property from being sacrificed, is, after placing such confidence in these professions of friendly aid, and through the influence of the person making them, induced to enter into a written contract or conveyance, which, in terms, professes to convey or transfer an absolute title to the whole property, for a sum far less than its actual value; when it appears by written and parol evidence combined, that notwithstanding the absolute character of the written contract, the vendor was led to believe he was nevertheless to be entitled to a part of the property, or to some interest therein; and yet subsequently to the written instrument the vendee fraudulently claims the whole title absolutely. In my opinion a court of equity is bound to grant relief to a confiding and deceived party, even against an absolute conveyance, when his grounds for relief are sustained by written and parol evidence combined, against the unrighteous demands of one, who, for the sake of gain, has abused the confidence produced by his professions of friendship towards a man in distress.

Whenever parties stand in a confidential relation towards each other, and any advantage is taken of that confidence, relief in equity will be administered with as much promptness as upon any other ground whatever. In *Billing vs. Southee,* 10 *Eng. Law & Eq. Rep.,* 39, 40, the Vice Chancellor says: "There is no part of the jurisdiction of this court more useful or more well founded than that which assumes the control over all transactions between persons occupying confidential relations towards each other. This jurisdiction ought to be exercised, whatever be the circumstances and position of the parties between whom the confidential relation exists, whether attorney and client, guardian and ward, or surgeon and patient." The latter relation was the one then under consideration. Other cases recognize the rule as applicable to

other instances than those here enumerated—such as trustee and *cestui que trust,* principal and agent, a clergyman and one of his flock. The instances mentioned by the Vice Chancellor, were therefore intended only as examples in illustration of the rule, and not as restricting the general proposition previously stated by him, to the enumerated cases. And why should not the rule apply to all, as well as to particular cases of confidential relations, which afford a favorable opportunity of obtaining an unfair advantage, or of exercising an improper influence? And it may be correctly said, there are few of such relations, which will enable a party more easily, or more effectually to obtain an advantage, or to exert an undue influence than when he has created a confident belief that he is acting the part of a friend, for the purpose of relieving a man of weak mind in distress, expecting to be deprived of his property by a pressing creditor, and that property constituting nearly, if not quite all the means which he has for the support of himself and family.

Speaking of the extent of the rule, in *Gibson vs. Jeyes,* 6 *Ves.,* 276, where a contract had been made between a client and his attorney, Lord Eldon uses the following language, in regard to the *onus* of proving the correctness of the transaction: "It is necessary to say broadly, that those who meddle with such transactions, take upon themselves the whole proof, that the thing is righteous." And on page 278, he says: "It is asked, where is that rule to be found? I answer in that great rule of the court, that he who bargains in matter of advantage with a person placing confidence in him, is bound to show, that a reasonable use has been made of that confidence; a rule applying to trustee, attorneys, or any one else." When used in such connection, "any one else," of course includes any party standing in a confidential relation, where the propriety of his contract is called in question.

In *Brooke, et al., vs. Berry,* 2 *Gill,* 102, the court say: "It can hardly be insisted that the appellee has not, in a contract with his principal, obtained a conveyance of his lands at a price greatly below their value, which of itself would induce a court of equity, (apart from the mental incapacity of the

principal,) to set aside the contract, unless it were shown, by competent testimony, that the contract was entered into in a way and under circumstances, which made it apparent that there had been no abuse of confidence, no undue influence, no imposition or material concealments practiced by the agent upon the principal, which could cast a shade of doubt as to the fairness and honesty of the transaction." Here, because of the relation of principal and agent, inadequacy of price alone was deemed sufficient to require satisfactory proof from the latter that the contract was fairly and honestly made.

In addition to the authorities I have referred to, see also those cited by the judge below, in regard to fraud arising from undue influence in cases of confidential relations between the parties.

In view of the authorities, I think there can be no doubt that when fraud is charged, parol evidence, especially when aided by written proof on the subject, may be admitted for the purpose of impeaching a written contract, whenever such evidence tends to show the existence of a confidential relation between the parties, that the contract is very disadvantageous to the vendor, who is a man of weak mind and much embarrassed in his affairs; and such evidence has a tendency to establish facts from which the inference may be drawn, that there has been improper influence exercised, or imposition practiced upon the vendor by the vendee, for the purpose of securing to himself an unfair advantage in the contract.

A conveyance cannot be successfully impeached for imbecility or feebleness of intellect alone, unless it be such as would justify the jury, under a commission of lunacy, in putting his property and person under the care of the Chancellor. But weakness, far short of that in degree, if coupled with other circumstances showing that such lesser weakness has been taken advantage of, will be sufficient to set aside a deed. 1 *Knapp.*, 78. 1 *Story's Eq.*, sec. 237.

The weakness of mind in the present case is not such as, of itself, could justify setting aside a conveyance.

G. W. McConkey, in testifying with regard to Watts' intellect, says: "If you include business of importance, Watts is

not a man of business habits.   If there is any financiering in
the business, Watts is not a man calculated to transact business
of that kind." He acted as a justice of the peace for several
years.   He was reappointed, but the witness does not know
whether he swore in or not.

Edward Riley says: "He really thinks Watts is not a man of
business and of business habits." He does not think "Watts
is a man of ordinary understanding, competent to make con-
tracts, and would not trust him to make a contract for him."
He thinks "Watts is in his usual mental faculties;" does not
know that "he ever was deprived of his mental faculties."
The witness does not know much of Watts' transactions.
His buying and selling has been in a very limited way since
he has been in the deponent's neighborhood.   He is a man
who is *compos mentis*, but his business habits are very limited.
The witness does not know, but should judge that Watts con-
ducted his business himself.

R. Hook says: "He should not judge that Watts was a
man of business and of business habits." This witness was
a judge of the magistrates' court, and for a short time Watts
was also one of the judges, and sat in the court two or three
times, but took no active part in the business of the court.
He believes Watts does transact his own business, and should
judge he was a man of common sense.   The witness never
had much business with him.

This testimony is not very strong proof of imbecility, but,
connecting it with the circumstances of the transaction, I regard
him so far below mediocrity as to allow his weakness of mind
to be treated as worthy of consideration in the inquiry, whether
he has been overreached through the instrumentality of abused
confidence.

On the 27th of April 1846, Watts filed in Baltimore county
court a petition in relation to the claim under the mortgage
given by him to Hook.   The petition states, that S. H. Tag-
gart, as trustee under the mortgage, had, during the same
month, advertised the mortgaged property for sale, but post-
poned the sale.   That Watts had contracted to sell the prop-
erty to Wilson for the sum of two thousand one hundred

dollars, being more than sufficient to pay the debt, including interest and costs. That the petitioner had notified the trustee of said sale, and had requested him to report it, but he refused to do so, and intended again to advertise the property. The object in filing the petition was, to obtain from the court an order directing the trustee to report the said sale. Watts signed the petition, and annexed to it is the following admission : "I admit the facts above stated, so far as I am concerned: —G. B. Wilson."

This is written evidence of an agreement for a sale of the entire mortgaged property, the title to which should be passed under the mortgage, through the instrumentality of a sale to be reported by the trustee.

The trustee and Isaac Tyson, Jr., (who had become assignee of the mortgage,) filed answers to the petition, objecting to a report being made as prayed for. But, on the 17th of November 1849, the objections of Tyson were withdrawn, and the cause submitted, without argument, by a solicitor for Watts and Wilson, and by Mr. Taggart, as trustee and solicitor for Hook:—whereupon the court passed an order, directing "the trustee to report the sale proposed by the parties, and set forth in the said petition. On the 20th of November 1849, the trustee, in obedience to the court's order, reported "the sale of the mortgaged premises in the proceedings mentioned unto the said Greenbury B. Wilson, for the sum of twenty-one hundred dollars, cash, to be paid on the ratification of the sale, with interest from the 27th April 1846, the day of sale." The same day on which the report was made Wilson and Watts filed their written consent to the immediate ratification of the sale as reported, and on that day the court passed an order of final ratification. The same day the trustee executed a deed to Wilson for the mortgaged premises, and two days after it was put upon record.

The proof shows, beyond dispute, that in April 1846, Watts was poor, and had good reason to fear he was about to lose his real estate on which he lived, and on which he relied for support.

A letter, dated the 9th of April 1846, to Watts from Wilson,

shows that he had been engaged in endeavoring to effect such an arrangement with the mortgagee and his trustee, or attorney, (Mr. Taggart,) as would stop the sale under the mortgage. After proposing that Watts, and Hook the mortgagee, should call on Saturday following, the letter concludes: "I can satisfy him about your security, and will go with him and you to Taggart's and save you from sacrifice."

The witness, Davis, says, that about April 1846, Wilson represented himself as the friend of Watts; and that Wilson said he felt a disposition to befriend Watts, to prevent him from being cheated or defrauded by Isaac Tyson, Jr. Davis also says, he and Wilson had frequent conversations, and the latter said that Tyson was endeavoring to wrong Watts and to get the mines for less than their value, calling Tyson some-times rather opprobrious names.

J. Hook, the original mortgagee, being examined as a witness, testifies, that he believes he saw Wilson in 1846, and took him to be a friend of Watts; that Wilson wished to take up the claim against Watts' property, and, of course, the witness took him to be a friend of Watts. And from what he saw he thought Watts placed confidence in Wilson.

Mr. Taggart says, as well as he can recollect, either after the first or second advertisement of the farm for sale, by him, as trustee, according to his understanding of the matter, Wilson, as the friend of Watts, called at the office of the witness, and stated that he had not the money, but offered his notes for the whole mortgage debt, which the witness declined taking.

Tyson testifies, that, as well as his recollection serves him, Watts and Wilson, together, called at his counting-room, and Wilson appeared to be the friend and counsellor of Watts. The witness so considered him at the time. They offered him the Bare Hill mines, and wanted to know what he would give for them. The property offered was that part of the farm which had been leased to Samuel Davis, being sixteen acres.

L. T. Watts, the daughter of the appellee, says, Wilson was at her father's house two or three times a week, and every Sunday; that her father placed confidence in Wilson, at the time, as his friend.

D. Stewart, Esq., speaks of a conversation between himself and Wilson, either in 1846 or 1847. He is rather doubtful which, but is disposed to think it was the latter year. Wilson represented that he had called at the request of Watts, and in consequence of the witness having written to Watts, the object of the proposed interview with whom Wilson wished to know. Mr. Stewart told him that he was a friend of Watts, and desired, if he could, to promote some satisfactory arrangement between Isaac Tyson and Watts in regard to the mineral lands of Bare Hill. Wilson said that no such arrangement could be made with Tyson; that Tyson wanted to take the advantage of Watts, and that he intended to protect Watts, so far as he could, from imposition. Wilson spoke of the said mineral land as being very valuable, and said they were important to Watts as his main dependence, and that Watts should not sacrifice them; that there was no chance of his arranging with Tyson for them at anything like a fair value.

Robert Wilson says, that Wilson, the appellant, stated to the witness, in the presence of Watts, "that he was the friend of Watts, and that he merely would undertake this thing to get him out of the clutches of Isaac Tyson, Jr., and Mr. Davis. He said that they were both trying to rob him (Watts) out of his house and home." This conversation occurred in 1846 or 1847. The witness had similar conversations with the appellant at his office, at the farm, and at the mine.

The appellant also said to this witness, in the presence and hearing of Watts, "that the mine was invaluable, and there was no telling the amount of money it was worth, and that he would not take any amount of money for it if he was Mr. Watts; that it would turn out to be a fortune for him. He also said, that if he was Mr. Watts he would not let Isaac Tyson, Jr., have it for any consideration." The same witness says: " Wilson told him that when Watts gained the law-suit between him (Watts) and Isaac Tyson, Jr., that it was his (Wilson's) intention to put it," (of course meaning the mine,) "into a stock company—putting the stock up to about one hundred thousand dollars—and that they, (Mr. Watts and himself, Wilson,) would retain either fifteen or twenty-five

thousand dollars apiece, so as to have the greater portion of the controlling power of the working of the mines, or words to that effect."

R. Hook, referring to a conversation between him and Wilson, in 1849, says, the substance of it was, that Wilson was acting as the friend of Watts. The witness "cannot tell the conversation, but it was on the subject of the Bare Hill mines." On a subsequent examination this witness says, he understood Wilson to say that he was the friend of Watts, and intended working the mine jointly with him when they got rid of the difficulties then hanging over their heads.

T. Mitchell states, that to the best of his recollection, in June 1849, he conversed with Wilson in the presence and hearing of Watts, when Wilson proposed that the witness should go and take charge of the Bare Hill copper mine under Watts and himself, Wilson saying "they intended to work it systematically, and they intended to make captain of deponent."

In regard to the value of the property Samuel Davis says, that, in his opinion, the copper mines were worth $6000 in April 1846. "He does not know what other people would have thought about the price they would bring at public auction at that time, but he thinks they would have brought six thousand dollars." This witness professes to be familiar with the character and value of copper mines generally, and he had a lease for five years on those mines, commencing in 1845. At the close of his lease, however, he was not able to pay his debts, as appears by his answer to the fifth cross-interrogatory.

J. Hook, (the mortgagee,) supposes the farm in April 1846 "was worth a good deal more than the amount of the mortgage debt. He does not know what it was worth, but he would have been willing to give more for it than his mortgage debt."

T. Mitchell thinks it hard to tell what the mines were worth in the summer and fall of 1849, but that if they had been for sale at public auction, they would have brought "ten thousand dollars at the least calculation." He worked in those mines in 1849, and never did anything in his life, as a business, but work at copper mines.

According to the testimony of James Farquharson, he, either as agent for Davis and Tyson, or for Tyson alone, made Watts an offer of four thousand dollars for the property, Watts reserving to himself one-fifteenth of the ore, also the dwelling-house and a few acres of land attached; which offer was rejected. This occurred, the witness thinks, in the spring or summer of 1846; and Tyson was exceedingly anxious to get the property.

G. W. White, the defendant's only witness, says, when he first became acquainted with the mines, about the 4th of May 1850, they were not worth five dollars. They were partly filled with water, to remove which would probably cost from four to five thousand dollars, and take at least seven months to do the work. He likewise says: "Before the monthly yield of the mines in ore was sufficient to meet the monthly expenses of working them, said Wilson must have been out of pocket at least ten thousand dollars, for moneys paid in cleaning the water out, for machinery, and other incidental and necessary expenses in working them, and for digging and breaking ground, and clearing it out, and in sinking shafts and driving cross-cuts through ground in which there was little or no ore found or obtained."

From estimates differing so widely, were it necessary to do so, it might not be a very easy task to ascertain the true value of the property; but no such necessity exists.

From Wilson's own declarations, it appears that, in 1846 and afterwards, he considered the mines to be of great value; certainly, valuable enough to render a sale of them for the amount of the mortgage claim *a sacrifice;* which claim, it seems from the auditor's report of the 27th November 1849, with interest and costs added, the interest being calculated to the 27th April 1846, amounted to only $15.66 less than $2100. Still Wilson insists that for $2100 he purchased the whole estate, absolutely, in April 1846. And this he does, although his own declarations, viewed in connection with the other proof in regard to value, must warrant the conclusion, that from 1846 to the fall of 1849, at least, the property was worth $4000, if not considerably more.

Wilson says to Watts, in a letter dated the 22nd of October

1846, "as respects the weighing of the ore, I suggested to Davis the propriety of getting you to see it weighed, *as you were interested.*" And again, "if any one of those hands who are experienced in mining would call and see me, I might propose something to induce him or them to search out another spot where ore could be found, either *on your place* or ours, by promising a fee."

In a letter, dated the 8th of April 1847, Watts is informed of the abundant supply of copper ore upon the premises, and of its very rich quality, as ascertained by analyzing a portion of it. And then, in reference to the suit pending between Tyson and Watts under a lease to Petherick, it is said, "Tyson's lawyer says he expects they will appeal, but he has not done it yet; whether he does or does not, is of but little *consequence to us.* I think matters look bright now, but you must be cautious how you talk and who you talk to; *plenty of money ahead—only have patience.*"

The 20th of May 1847, is the date of a letter which contains the following language, "Well, the more mines that are found and worked *the better for us;* and if the ore is found on Buchanan it must still run back *on your ground,* so let them go ahead. . . . . . . Only keep cool and look sharp, *the money will come, sooner or later, in no small sums.*" The italics in the quotations from these letters are my own.

If, as Wilson now contends, he had purchased the entire estate in April 1846, how was Watts *so interested* in the ore as to make it proper in October following, that he should see it weighed? Or why say, "either *on your place or ours,*" speaking of searching for another spot where ore might be found; when it was known that Watts had not owned any other real estate except the mortgaged premises? And if the whole property had been sold for the sum of $2100, why, in the following year, should Watts be informed of the quantity and richness of the ore? Why told, "plenty of money a-head, only have patience?" having reference to finding ore on "Buchanan,"—which adjoins the property in dispute:—why say to Watts "it must still run back *on your ground?*" And why tell him, "only keep cool and look sharp, *the money will*

*come, sooner or later, in no small sums?''* If he had sold the entire estate for a specified sum he could not be entitled to any thing more, and therefore, so far as he was concerned, it was a matter of no importance whether there was "plenty of money a-head" or not—whether he had patience or not— whether he did or did not keep cool and look sharp—or whether or not "the money would come, sooner or later, in no small sums."

Although the petition of 1846, and the proceedings consequent upon it, would, of themselves, seem to indicate, that for the consideration of $2100 Wilson should have a title to the whole property, yet his acts, his declarations, and his letters, must have been designed, or, at all events, were amply sufficient, to induce a confident belief on the part of Watts, that under the title thus to be transferred he was not to part with his entire estate. Wilson had declared his intention to save the property from being sacrificed by a sale under the mortgage. Now, if a sale for the mortgage claim would have been a sacrifice, so would an absolute sale for $2100. Watts therefore could not have imagined his professed friend was engaged in doing the very thing he had censured others for designing to do; and which he had said it was his intention to prevent. As a friend, Wilson had interceded with the mortgagee and his trustee to prevent a public sale under the mortgage, and had offered to give his own notes for the whole claim. He had declared, both in and out of Watts' presence, that he was acting as his friend in the matter; spoke of the great value of the property, especially to Watts, as being his main dependence for support; of the intention of others to take advantage of him, and to rob him of his house and home; and avowed his determination to protect him from imposition, and to save his property from being sacrificed.

Such proof as is set forth in the previous part of this opinion can scarcely leave a doubt, that Watts was thereby led to believe he was dealing with a friend, whose purpose was not to acquire a title to the estate for his exclusive use, but to preserve for Watts, at least a portion of the property or some interest in it. But if, after an examination of this proof, there

should be any doubt on the subject, that doubt must be removed when such proof is considered in connection with the paper marked J; which is in the following language:

"Thomas B. Watts, and his wife Mary Ann Watts, has sold to Greenbury B. Wilson one-half of the farm he now occupies on Bare Hill, call'd Bare Hill, cont'g 93½ acres, more or less, together with the entire control and privilege of mining for copper and other minerals, and carrying away on the whole tract forever, with the understanding that one-half of the nett proceeds of all minerals are to be paid over to said Thomas B. Watts, and his heirs and assigns. The said Thomas B. Watts, his heirs and assigns, to have the exclusive benefit of all crops rais'd by him on said farm.

*Baltimore, 15th Feb'y* 1849.

THOS. B. WATTS,

G. B. WILSON.

In the event that G. B. Wilson raises a stock company, or can sell the whole tract for a handsome remuneration, to the mutual advantage and benefit of both parties equally concerned, then the parties hereto are respectively bound to such an arrangement, their heirs and assigns.

Witness, this 15th February 1849.        A. CLIFTON."

This agreement is not only signed by the appellant but he admits it to have been written by him.

But the appellant says, admitting that paper J proves a sale of only one-half of the farm, *at that time,* it does not preclude the possibility of showing the acquisition by Wilson of a title to the other half, between the date of that agreement and the perfection of the title by the deed from Taggart as trustee. And it is insisted that the ownership of the entirety by Wilson, is conclusively established by the acts and declarations of the complainant, and by the paper marked P, dated the 1st of June 1849, which is as follows:

"All my right, title and interest in the Bare Hill copper mines, and the houses and improvements appertenant thereto, during the term of five years, from the tenth day of July 1845, with the right of reversion and possession, as secured to me, I hereby assigne and transfer to G. B. Wilson, for value received.        THO. B. WATTS,  (Seal.)"

Wilson admits that he wrote the exhibit AWB; and requested Watts to sign it. P, it appears, is in the handwriting of Watts and is an exact copy of AWB.

Although this paper professes to have been executed for the purpose of assigning and transferring the property "for value received," yet, from the appellant's admissions, it is evident he did not pay anything as consideration; or purchase money, for the estate, until after the sale was ratified by the court; and his admissions also show clearly, that paper P was not based upon any other consideration than that mentioned in the petition and in the trustee's report of sale.

Prior to the execution of this paper, (P,) the petition stated a sale had been made at the price of $2100. The oral declarations and letters of the appellant, in connection with paper J, show, that for the $2100 not more than one-half of the estate had been sold. And yet, without any obligation on Wilson, to pay one cent of additional consideration; at his request, Watts executed paper P, which professes to assign and transfer all his right, title and interest in the mines. These circumstances, viewed in connection with the nature and terms of the application of the appellant to the appellee; to execute this instrument, furnish satisfactory evidence, that it was not to be a new contract; in regard to any other sale between the parties, than the one previously made; and which was to be consummated under the petition and the proceedings upon it, and consequently, in a court of equity, should be subject to all the qualifying terms connected with that original contract.

Wilson says: "That he did present to Thomas B. Watts the complainant's exhibit, marked AWB, admitted to be in this respondent's handwriting, and requested him to sign it as evidence of his, the complainant's; sale to this respondent of the Bare Hill farm and copper mine; so that said respondent could use it at the approaching trial between himself and said Davis, because this respondent's deed from said Taggart to this respondent was not then executed." Thus the request was not for evidence of a new, but of the old sale. And if Wilson intended, by this instrument, without any additional or new consideration, to secure to himself any larger portion

of the estate than he was entitled to, under the existing con-tract, it was imposition, practiced by him, upon the party whose confidence he had gained by his professions of intended friendly assistance.

It may well be doubted, whether P was not intended merely for the purpose of enabling Wilson to use it in a controversy between him and Davis, and not designed to have any effect as between the present parties. No use was made of it in the mortgage case. The day of sale, as there reported, was the date of the petition, from which date interest was to be charged. And although paper J was made an exhibit in the original bill, the answer to it contains not the slightest allusion to P. It was first brought into the cause by the defendant, under the commission to take testimony.

The inference, that this paper was only designed to be used on the trial between Wilson and Davis, is aided by the fact, that it does not profess to include the whole mortgage property, as mentioned in the *petition*, and the sale as ratified, but relates only to the "Bare Hill copper mines and the houses and improvements appurtenant thereto, during the term of five years from the tenth day of July 1845, with the right of reversion and possession thereof." And the lease to Davis bears date the 10th of July 1845, is for five years, and includes only sixteen acres of land, within which are the mines and the improvements attached to them.

This paper is dated the 1st of June 1849, and yet, during that month, in a conversation between the witness Mitchell and the appellant, in the presence of the appellee, in relation to the Bare Hill mine, it was proposed by Wilson, that the witness should take charge of the mine under Watts and Wilson, the latter saying, "they intended to work it systematically, and they intended to make captain of deponent."

From the testimony of J. T. Watts it will be seen, that after the year 1849, and shortly after he had left his father, (the appellee,) Wilson said to the witness "he was doing very wrong in leaving his father as he had done, that the business was then about to be settled between Tyson, Davis, himself, (Wilson,) and deponent's father, and he thought then that

they would be able to realize something right handsome from the copper mines, and he said he saw no necessity at all for deponent's leaving home."

R. Hook likewise had two or three conversations with Wilson, in which he was understood to say: "That he was the friend of Mr. Watts and intended working the mine jointly with him when they got rid of the difficulties then hanging over their heads."

Even so late as the 22nd of November 1849, (the very day on which the trustee's deed was put upon record, and two days after the date of the final ratification of the sale and date of the deed,) Wilson wrote to Watts a letter, in which it is said:

"Richard Hook saw Johnzee and will have the money taken out of Taggart's hands; nothing done in the other matter, but we expect you will be in to-morrow morning, as it will be necessary for you to deed one-half of Bare Hill to me, according to our agreement."

This letter is admitted to be in the handwriting of Wilson, but in consequence of not being signed by him, it is objected to as inadmissible evidence. For want of the signature it could not be used to establish an express trust, for a writing not signed will not transfer an interest in land or create a trust. But such a letter or writing as this will be admitted as evidence in support of a charge of fraud or imposition, in the same manner that parol proof will be allowed for such a purpose.

With such proof before me, I cannot believe that paper P was designed to be evidence between the parties of a full claim in Wilson, either to the whole of the mortgage premises, or to the mines with their appurtenances.

After a very laborious and thorough examination of the case, I am brought to the conclusion, that the parties stood in a confidential relation toward each other, the appellee having great confidence in the appellant, and the latter having much influence over the former. This was the consequence of poverty, great embarrassment, and some degree of mental weakness on one side, with a voluntary offer of assistance and relief on the

other, accompanied with acts indicating the sincerity of such an offer. Under these circumstances the parties entered into a contract, which, according to the terms set forth in the petition, would seem to be an absolute sale of the whole mortgage premises at $2100. A price greatly below the full value of the property. The proof, however, makes it perfectly evident, that Watts was led to believe he had actually sold but a part of his estate. And to the influence of Wilson, resulting from Watts' confidence in him, may be ascribed, not only the terms of the contract, as stated in the petition, but also the consent to the ratification of the sale, the latter believing himself safe in the hands of a man who came forward to relieve him in time of need, with the avowed purpose of saving his property from being sacrificed.

How could he imagine that the man who was promising to do this was then actually engaged in making a contract, by which he was securing to himself the entire property forever, for a mere trifle above the amount due upon the mortgage, a sacrifice for which claim the professed friend had repeatedly promised to prevent?

Whenever a title, although absolute on its face, has been acquired at a price much below the real value, by a vendee standing in a confidential relation to his vendor, if from written and parol evidence combined, it appears satisfactorily that the former has led the latter to believe he is, nevertheless, to continue the real owner of part of the property, the vendee should not be permitted to keep the whole. And such title having been acquired, through the instrumentality of a decree, will not prevent the title from being impeached, if the influence arising from such a relation continues to exist at the time of the decree. A party claiming the whole title, under the circumstances stated, would be committing fraud of such a character as the morals of a court of equity should never permit to be successfully carried into effect. And applying this doctrine to the present case, I think the evidence, fully entitles the complainant to relief.

I agree with the judge below in that portion of his opinion in which he argues, that the decree in the mortgage case is

liable to be impeached upon the ground of fraud or undue in-
fluence: and that the consent of Watts to the ratification of
the sale is not a sufficient confirmation of the original contract
to remove all objection to the validity of the decree.   He very
correctly holds, that subsequent acts will not amount to con-
firmations of previous contracts, which are liable to be im-
peached for undue influence, unless it appears that the influence
has ceased to exist when the subsequent acts occur.   And I
also agree with him in believing, that in this case the evidence
is quite the reverse of tending to show that the influence which
the appellant had acquired, at the time of the original contract,
did not exist when Watts consented to the ratification.

Another ground in opposition to the relief claimed by the
complainant is, that if the transaction between the parties is a
fraud, it is such upon the rights of third persons.   And under
the rule, *in pari delicto potior est conditio defendentis,* the
complainant will not be permitted to allege his own fraud to
invalidate his own contract.

The object of the rule was to discourage fraud by prevent-
ing the accomplishment of its design.   But to apply the rule
as now insisted upon, instead of operating as discouragement,
would really be giving a premium for fraud.   It would inflict
punishment upon a party, who, in consequence of misplaced
confidence, under circumstances of distress, had become the
dupe of undue influence, and would reward, not merely a
participant in the fraud, but the chief actor in its concoction,
he being the only party who, at the time of filing this bill,
and ever since, could be injuriously affected by granting the
relief sought by the complainant.

Particular reference is made, in this opinion, to such evi-
dence as I rely upon in support of the views expressed; it is,
therefore, unnecessary to say, whether the evidence not used
is admissible or should be rejected under the appellant's excep-
tions.

Upon the ground of fraud and imposition, I think the aver-
ments contained in the original and amended bills, and the
proof in the cause, entitle the complainant to relief.   And the
title of the parties to the property should, in my opinion, be

settled upon the basis of exhibit J. I have arrived at this con-
clusion in consequence of being fully satisfied, that whilst the
parties stood in a confidential relation, Wilson acquired great
influence over Watts, which influence was unfairly exercised,
for the purpose of securing to the former a title to the whole
estate, by inducing the latter to believe the title was, in reality,
only to be such as that described in the exhibit J.

We have seen, that in *Wesley vs. Thomas*, it is said, a
court of chancery, in the exercise of its moral jurisdiction,
"will, upon the proof of *fraud*, mistake or surprise, raise an
equity by which the agreement of the parties shall be recti-
fied." And in *McElderry vs. Shipley, et al.*, it is likewise
said, "A court of chancery will, upon proof of fraud, mistake
or surprise, raise an equity by which the agreement will be
rectified according to the intent of the parties."

From what has been said, it will be seen, that I do not
concur with my brethren in holding that the decree below
should be reversed and the bill dismissed.

In my opinion the cause should be remanded, under the
act of 1832, ch. 302, without reversing or affirming the decree,
for the purpose of correcting, what I consider, a mistake of
the judge, in regard to the net profits of the mines. But as
the majority of this court think the bill should be dismissed,
and as this opinion is already long enough, I shall not under-
take to point out the mistake to which allusion has been made.

Le Grand, C. J.

I dissent from the conclusions arrived at by my brother
Eccleston, in the very full and elaborate opinion he has
given in this case. But few words will be necessary to point
out the grounds on which rest that difference, In my opinion,
on legal principles, there ought not to be the slightest difficulty
in reversing the decree of the circuit court. And all that can
arise, in any aspect of the case, grows out of an association
with it of matters which have, according to well known and
universally acknowledged decisions, nothing whatever to do
with the questions involved.

*What is the case?* The complainant alleges, in substance,

that a fraud has been practiced upon him by the appellant; and in this: That the defendant induced him to consent to the purchase, by the defendant, of certain property belonging to him, and which had been authorised to be sold by a trustee to secure the payment of a mortgage debt with which it was encumbered; that in pursuance of this inducement, he did consent, and, accordingly, as is shown by the record of pro- ceedings in the cause, he, by petition, asked the court to ratify the report of the trustee setting forth such sale—which was done, and in conformity therewith, a deed for the property was made by the trustee to the defendant. The complainant alleges this was a fraudulent transaction, and that it was never the intention of the parties, the defendant should thus acquire a title to the whole property. The bill asks that the decree of Baltimore *county* court, ratifying the sale to the defendant, may be annulled and the deed of the trustee declared void, and for an account of the profits, &c.

The complainant does not pretend he did not know, when he signed the petition to the county court, what he was doing.

The case now sought to be made for him is, that the de- fendant being of superior mind, and exercising great control over him, because of his supposed friendly feeling, induced him (intending to defraud him) to consent to the report of sale, and its ratification by the court.

There is no *direct* proof whatever, of any secret under- standing between the parties, that the transaction should not be what it appeared on its face to be; and the existence of any such is positively and unequivocally denied by the de- fendant, as is also all contrivance, &c., to defraud the com- plainant.

Now it is conceded (and it could not be well denied) by my learned brother, that no relief would be granted to a com- plainant so situated; *unless* the transaction be tainted with fraud.

The general principle being admitted, the only inquiry re- maining is: Is there such fraud, if any, in this case, as will take it out of the unquestioned and undeniable general prin- ciple?

As a *general rule,* fraud vitiates all things in a court of equity. *But this rule has its limitations.* It is the wisdom and the policy of the law, to protect the *innocent* and helpless from the bad practices of the evil and fraudulently minded; and whenever a proper case presents itself, relief is never withheld.

One of the exceptions to the general rule, (and the one which in my judgment governs this case,) is, *that where both parties to the suit have knowingly participated in the fraud, all relief, as between them, will be denied.* The maxim, *in pari delicto potior est conditio defendentis,* is everywhere acknowledged and enforced.

If this rule be applied, how stands this case? Thus: The complainant, according to the facts alleged by himself in his bill, unites with the defendant in the practice of a fraud on a *court of justice,* and now asks that a court of equity—the fraud having been consummated—will remit him to rights which he claims were by force of a secret, *unwritten* agreement, reserved to him. It cannot be done, unless every decision heretofore made on analogous cases be set aside or overruled. It may be safely averred there cannot be found, save one—and that was by a divided court—a decision, either in England or in this country, in which relief was granted in a case similar to this. The fact is, the whole matter has been most completely and decisively settled by the adjudications of the highest tribunals of this State.

In the case of *Freeman and Sedwick vs. Sedwick,* 6 *Gill,* 28, one infinitely stronger than that now before us, the court recognize and adopt the rule, that relief will never be granted where the parties are *in pari delicto.* That was the case of one brother conveying his property to another, to keep it out of the reach of the creditors of the grantor, accompanied by another agreement in writing, although to be considered secret, obliging the grantee to reconvey in a certain contingency. What said the court, when asked to enforce by decree the agreement to reconvey? It refused to do so, and on the obvious ground of public policy, that those who enter into fraudulent contracts, *so far as they are concerned* must abide

the consequences. In the case to which I refer, the principal authorities in England and this country are reviewed, and all shown to inculcate and establish the doctrine 1 have already. indicated. It is not necessary to re-state them here. They will be found fully and accurately set out in the volume of Reports to which reference has been given.

As had been stated, the complainant does *not* pretend ignorance of the character of the paper which he signed. The case of *McElderry vs. Shipley, et al.*, 2 *Md. Rep.*, 25, shows; that in such a case a court of equity will not give a different meaning to the paper from that which its language imports; so that, were it competent by parol to show the parties intended something other than that expressed, the instrument would not be reformed. Of course I allude to a case in which there was an absence of mistake or fraud.

These views, in my judgment, fully dispose of this case. But it is said, the complainant at the time of the transactions was of a weak mind, liable to be easily imposed upon by the cunning and knavish, and because of this mental imbecility; readily became the dupe and victim of the defendant:

In what this imbecility consisted does not appear. While it can be clearly deduced from the evidence in the cause, that some of the witnesses entertained no very high opinion of his *"financiering"* abilities, it is also clearly shown by the proof, that he was not *non compos mentis*, and that, he transacted his own business, gave deeds and leases, and mortgages; and acted for years as one of the judges of the district courts of his county. The language of Judge Archer, in the case of *Watkins vs. Stockett*, 6 *H. & J.*, 443, is very pertinent to this branch of the case:—He says: "It was observed by a distinguished jurist, Sir Joseph Jekyll, that where a weak man gives a bond, if there be no fraud nor breach of trust in its obtention, equity will not set aside the bond, for the weakness of the obligor alone; if he be *compos mentis*. Nor will a court of equity measure the size of men's understanding and capacity, there being no such thing as an equitable incapacity where there is a legal capacity. This is undoubtedly the

safest doctrine, where there is a total absence of all fraud and imposition."

It must be borne in mind that this is a case between the parties, and *only* the parties, to the alleged fraud. Were it a case between the *creditors* of the complainant and the defendant, a different class of principles would be applicable. In the latter case, the creditors would not be estopped by any fraudulent act of either the complainant or defendant, but would be at full liberty to inquire into the whole transaction.

For wise purposes—and the experience of centuries has demonstrated the wisdom—the law has established certain, fixed, and inexorable principles for the administration of justice, for the protection of the rights of property, and for the ascertainment of truth. These are not lightly to be departed from. If they are to be disregarded in one instance, *why not in all?*

The indulgence of mere sympathetic feeling, however honorable to the instincts of human nature, furnishes no excuse for such judicial partiality. There is no canon of the law of more universality than, *omnis innovatio plus novitate perturbat quam utilitate prodest;* and, in a commentary on it, a very learned writer very properly remarks: "It is an established rule to abide by former precedents, *stare decisis,* where the same points come again in litigation, as well to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion, as also because the law in that case being solemnly declared and determined, what before was uncertain, and perhaps indifferent, is now become a permanent rule, which it is not in the breast of any subsequent judge to alter or vary from according to his private sentiments." And again, "If, as has been observed, there is a general hardship affecting a general class of cases, it is a consideration for the Legislature, not for a court of justice. If there is a particular hardship from the particular circumstances of the case, nothing can be more dangerous or mischievous than, upon those particular circumstances, to deviate from a general rule of law."

In the case before us the party complaining knew what he was doing; he does not even pretend ignorance. To him should be applied the language of Lord Chief Baron Richards,

in *Roberts vs. Roberts*, 4 *Eng. Exchq.*, 448. That was a case in which a bill was filed for the purpose of setting aside a voluntary demise of certain hereditaments for a term of years, executed by the testator, in his lifetime, to the defendant, to kill game. In his opinion the judge said: "I do not think the plaintiffs are entitled to a reconveyance; the deed was executed maturely; the grantor knew the effect of it. There was no fraud, at the time, between the brothers; with respect to them the transaction was perfectly fair. But it appears by the evidence that the object of the deed was to give the defendant the appearance of a qualification, and that it was executed for no other purpose; *that was a fraud on the law, and I cannot perceive what right that gives the plaintiffs to come into a court of equity to call for a reconveyance.*"

It was suggested, in the course of argument at the bar, that the *county* court had, under the circumstances of the case, no jurisdiction under the provisions of the act of 1826, chapter 296. In this opinion I cannot concur. Although under that act the authority to sell is derived from the bond of the trustee, and the power of attorney, executed by the mortgagee, and not, primarily, under a decree of a court of equity, as in other cases, yet the jurisdiction of the court becomes complete on the *report* of the sale. When this is once made, the equitable cognizance of the court obtains, and thereafter equitable principles, such as are applicable to sales under decrees in chancery, control the disposition of the case; and, according to these, it is the well established practice for courts of equity to ratify sales, made without public notice, whenever the parties in interest shall signify, in writing, their assent to such a purpose. The case of *Andrews vs. Scotton*, 2 *Bland*, 629, is sufficient authority for this doctrine.

For the reasons given, I am of opinion, the decree of the circuit court ought to be reversed and the bill dismissed.

MASON, J.:

I frankly confess I have had great difficulty in coming to a conclusion in this case, and I would be the better satisfied if the result to which I have at last arrived, was as firmly sanc-

tioned by my own mind, as my conclusions usually are. The difficulty with me grows out of the circumstance, that the proper application of the statute of frauds, which Chief Justice Buchanan has said, "probably generates as many frauds as it prevents," leads to results, in this particular case, which are repugnant to sound morals and fair dealing.

The evidence has failed to satisfy my judgment, that the defendant, Wilson, practiced a fraud upon the complainant, in inducing him to make the application to the court to have the sale of the trustee reported and ratified in the proceedings upon Hook's mortgage; in other words, that Watts was induced to do one thing in that matter, under the influence of Wilson's deceptions, while he supposed he was doing another. While I am satisfied that the ratification of the sale to Wilson was made with the full understanding and knowledge of Watts as to the nature of the transaction, yet I am equally clear that there was a secret or private understanding between them, that Wilson was eventually to have but one-half of the property and Watts the other, an understanding which Wilson, in bad faith, now refuses to recognise.

While Watts has been, in this particular, made the victim of misplaced confidence in Wilson, there is no power in this court to grant him relief. If I am correct in the conclusions to which I have come in regard to the facts of this case, the law regulating such a state of case is plain and well settled. Where it cannot be shown that the contract had its inception in the fraud of the party against whom the relief is sought, but that he is merely making a fraudulent use of the statute, to keep an advantage obtained through the reliance of the opposite party on his good faith and fair dealing, no relief can be granted. The principle is broadly sanctioned by Chief Justice Buchanan, in delivering the opinion of this court in *Lamborn vs. Watson,* 6 *Har. & John.,* 252. He there says: "The action is not founded on deceit, &c., practiced by the defendant, by which the plaintiff was tricked into a false confidence, and seduced into a contract by which he has lost his property; but on a verbal agreement respecting the sale of lands, not sought for, or moving from the defendant, but procured by

the plaintiff himself for his own purposes, on which, without overturning the statute of frauds, an action at law will not lie." And again he says: "But they cannot entertain actions upon verbal contracts within the statute, on the ground of fraud, in refusing to perform them; if they could, it would be to permit a plaintiff, in the shape of an action on the contract, to recover in damages, not for the breach of the contract as such, but for a fraud subsequently conceived, and on which the action was not founded, as is attempted in this case, which would be to amend the statute in relation to such contract."

The same doctrine was held in *Lamborn vs. Moore,* 6 *H & J.,* 422. Our brother ECCLESTON, in his opinion in this appeal, also sets out the same principle correctly, not agreeing however in its application to this case. See also the notes to the case of *Wollam vs. Hearn,* (*White & Tudor's Eq. Cases,* 355,) 71 *Law Lib.,* 540. The same principle is recognised in *Wesley vs. Thomas,* 6 *Har. & John.,* 24, and *McElderry vs. Shipley,* 2 *Md. Rep.,* 25, where this court announce broadly that parties must be bound by the language with which they may think proper to express themselves, in a deed or other instrument.

The statute of frauds is as binding in equity as it is at law, and therefore the fact that the relief is sought in this case in a court of equity does not vary the principle.

If the views I have taken in regard to the facts of this case be correct, the defendant, Wilson, has very justly made himself liable to the severe animadversions directed by Judge Buchanan, in *Lamborn vs. Watson,* against the defendants in that case, as well as those of our brother ECCLESTON in his opinion in this case against the present defendant, but as we cannot grant the complainant the relief he seeks, a moral castigation upon the defendant would do but little to heal the wounds which he has sustained in his property and rights.

Notwithstanding it might have been understood between these parties, that while Wilson was to appear from the proceedings to have purchased the entire estate, he nevertheless, by a secret agreement, was only to have one-half, I do not think that such an understanding would amount to such a fraud upon the court as to place the parties *in pari delicto.*

The only parties interested in the proceedings to foreclose the mortgage were the creditor and the mortgagor.   The power of the chancery court was invoked only to enforce the payment of the mortgage debt, and to protect at the same time the rights of the debtor.   Any arrangement, therefore, which would produce these two results, though in a way somewhat different from that employed by the court in its usual course of proceeding, could hardly be deemed a fraud upon the court, or upon any party having an interest in the matter.   Watts, himself, could not be said to be defrauded, if he participated in the arrangement, knowing what he was doing; nor was the creditor, because, by it, he obtained his money; nor was the court, because its powers and functions were not perverted from their legitimate purposes, but were permitted to perform their office in securing *to the* creditor the fruits of his debt.

Concurring with the Chief Justice in the conclusions to which he has arrived, but not in all the reasons he assigns, the decree must be reversed and the bill dismissed.   Under the peculiar circumstances however of this case, and as the subject of costs is under the unrestricted discretion of the court, I think the appellant should pay all costs in both courts.

*Decree reversed and bill dismissed.*